NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 21-7109, 21-7110, 21-7111

# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL ATM COUNCIL, INC.; ATMS OF THE SOUTH, INC.; BUSINESS RESOURCE GROUP, INC.; WASH WATER SOLUTIONS, INC.; ATM BANKCARD SERVICES, INC.; SELMAN TELECOMMUNICATIONS INVESTMENT GROUP, LLC; TURNKEY ATM SOLUTIONS, LLC; TRINITY HOLDINGS LTD, INC.; JUST ATMS USA, INC.; 901 FINANCIAL SERVICES LLC,
APPELLEES

AND

ANDREW MACKMIN; BARBARA INGLIS; SAM OSBORN;
APPELLEES

AND

PETER BURKE; KENT HARRISON; MARIN P. HEISKELL; BRYAN BYRNES,
APPELLEES

*v.*

VISA INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; PLUS SYSTEM, INC.; MASTERCARD INC.; MASTERCARD INTERNATIONAL INC.,
APPELLANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (CIV. NOS. 11-1803, 11-1831, 11-1882) (THE HONORABLE RICHARD J. LEON, J.)*

**BRIEF OF APPELLANTS**
**PUBLIC COPY—SEALED MATERIAL DELETED**

MATTHEW A. EISENSTEIN
ROSEMARY SZANYI
R. STANTON JONES
ARNOLD & PORTER KAYE
  SCHOLER LLP
  *601 Massachusetts Avenue, N.W.*
  *Washington, DC 20001*
  *(202) 942-5000*

KENNETH A. GALLO
JUSTIN ANDERSON
MITCHELL D. WEBBER
MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Appellants Visa Inc., Visa U.S.A. Inc., Visa International Service Association, Plus System, Inc., Mastercard Inc., and Mastercard International Inc., make the following certification:

**(A)   Parties and Amici.**

**Appellants:**  Visa Inc. and Mastercard Inc. are publicly held corporations.  Visa Inc. and Mastercard Inc. have no parent company, and no publicly held company owns 10% or more of the stock of Visa Inc. or Mastercard Inc.

Visa U.S.A. Inc. is a non-stock corporation.  Visa Inc., a publicly held company, is a parent company of Visa U.S.A. Inc. and has a 10% or greater ownership interest in Visa U.S.A. Inc.

Visa International Service Association is a non-stock corporation.  Visa Inc., a publicly held company, is a parent company of Visa International Service Association and has a 10% or greater ownership interest in Visa International Service Association.

Plus System, Inc. is a non-stock corporation.  Visa U.S.A. Inc. is a parent company of Plus System, Inc. and has a 10% or greater ownership interest in Plus System, Inc.

Mastercard International Inc. is a Delaware membership corporation that does not issue capital stock, and is a wholly owned subsidiary of Mastercard Inc.

i

**Appellees:**

(i)    In *National ATM Council, Inc.* v. *Visa Inc.*, the following parties appeared before the district court (Civ. No. 11-1803):  ATM Bankcard Services, Inc.; ATMs of the South, Inc.; Business Resource Group, Inc.; Cabe & Cato, Inc.; Just ATMs, Inc.; Just ATMs USA, Inc.; Meiners Development Company of Lee's Summit, Missouri, LLC; Mills-Tel, Corp d/b/a First American ATM.; National ATM Council, Inc.; Randal M. Bro d/b/a T&B Investments; Scot Gardner d/b/a/ SJI; Selman Telecommunications Investment Group, LLC; Turnkey ATM Solutions, LLC; T&T Communications, Inc.; Trinity Holdings Ltd, Inc.; Wash Water Solutions, Inc.; 901 Financial Services LLC.  Only the following parties are before this Court on appeal (No. 21-7109): ATM Bankcard Services, Inc.; ATMs of the South, Inc.; Business Resource Group, Inc.; Just ATMs USA, Inc.; Selman Telecommunications Investment Group, LLC; Trinity Holdings Ltd, Inc.; Turnkey ATM Solutions, LLC; Wash Water Solutions, Inc.; and 901 Financial Services LLC.

(ii)    In *Mackmin* v. *Visa Inc.*, the following parties appeared before the district court (Civ. No. 11-1831):  Lynne Bartron, Charles Brown, John Epseland, Barbara Inglis, Andrew Mackmin, and Sam Osborn.  Only the following parties are before this Court on appeal (No. 21-7110): Barbara Inglis, Andrew Mackmin, and Sam Osborn.

(iii)    In *Burke* v. *Visa Inc.*, the following parties appeared before the district court (Civ. No. 11-1882):  Peter Burke, Bryan Byrnes, Kent Harrison, Marin P. Heiskell, and Mary Stoumbos.  Only the following parties are before this Court on appeal (No. 21-7111): Peter Burke, Bryan Byrnes, Kent Harrison, and Marin P. Heiskell.

(B)    **Ruling Under Review.**  The ruling at issue in this appeal is the August 4, 2021, Memorandum Opinion granting appellees' motions for class certification by Judge Richard J. Leon of the United States District Court for the District of Columbia in Civ. Nos. 11-1803, 11-1831 & 11-1882.  *See* JA572-587.  That ruling is not yet reported, but it is available at 2021 WL 4099451.

(C)    **Related Cases.**  This case was previously before this Court as *Osborn* v. *Visa Inc.*, Nos. 14-7004, 14-7005 & 14-7006.  This Court's prior decision vacating and remanding the district court's grant of appellants' motion to dismiss is reported at 797 F.3d 1057.  Appellants are unaware of any related case involving substantially the same parties and the same or similar issues.

# TABLE OF CONTENTS

                                                                                                          Page

Table of authorities ........................................................................................vi

Glossary ........................................................................................................ix

Statement of jurisdiction..................................................................................1

Statement of the issue.......................................................................................1

Statement of the case .......................................................................................1

      A.    Background.........................................................................................3

      B.    Procedural history ............................................................................9

Summary of argument ....................................................................................14

Standard of review..........................................................................................17

Argument........................................................................................................17

I.      Interlocutory review is warranted ..........................................................17

II.     The district court erred by certifying three classes without scrutinizing the evidence of classwide injury...........................................19

      A.    Before certifying a class, courts must determine whether uninjured class members can be identified and winnowed out by common proof ...............................................................19

      B.    Because the district court expressly declined to resolve the issue of classwide injury until the merits stage, it committed reversible legal error .................................................................26

III.    Denial of class certification is required because each class cannot exclude significant numbers of uninjured class members.......................31

      A.    The undisputed evidence demonstrates that each of the three putative classes cannot identify and exclude uninjured class members through common proof.........................32

            1.    According to *Mackmin*'s own theory of injury, the proposed class includes a substantial number of uninjured members .............................................................32

            2.    The proposed *Burke* class's injury model is also incapable of excluding uninjured class members.................36

3.  The proposed Operator class necessarily includes uninjured members but offers no winnowing mechanism ........................................................................42

B.  The Court should vacate and remand with instructions to deny class certification ..............................................................45

Conclusion ...........................................................................48

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Products, Inc.* v. *Windsor,*
    521 U.S. 591 (1997)..................................................................20

*American Express Co.* v. *Italian Colors Restaurant,*
    570 U.S. 228 (2013)..................................................................20

*American Trucking Associations, Inc.* v. *E.P.A.,*
    175 F.3d 1027 (D.C. Cir. 1999),
    *aff'd in part, rev'd in part on other grounds,* 531 U.S. 457 (2001)..............47

*Amgen* v. *Connecticut Retirement Plans & Trust Funds,*
    568 U.S. 455 (2013)..........................................................19, 20

*In re Asacol Antitrust Litigation,*
    907 F.3d 42 (1st Cir. 2018) ................................21, 25, 41, 46

*Bell Atlantic Corp* v. *AT&T Corp.,*
    339 F.3d 294 (5th Cir. 2003)....................................................25

*Comcast Corp.* v. *Behrend,*
    569 U.S. 27 (2013)..................................................................20

*Denney* v. *Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006) ...................................................25

*DL* v. *District of Columbia,* 860 F.3d 713, 724 (D.C. Cir. 2017).......................17

*Ferreras* v. *American Airlines, Inc.,*
    946 F.3d 178 (2019) ..............................................................46

*Florez* v. *C.I.A.,*
    829 F.3d 178 (2d Cir. 2016) ...................................................47

*Halvorson* v. *Auto-Owners Insurance Co.,*
    718 F.3d 773 (8th Cir. 2013)..................................................25

\* Authorities upon which we chiefly rely are marked with asterisks.

vi

Cases—continued:                                                                 Page

*Hudock* v. *LG Electronics U.S.A., Inc.*,
    12 F.4th 773 (8th Cir. 2021) .................................................................45

*In re Lamictal Direct Purchaser Antitrust Litigation*,
    957 F.3d 184 (3d Cir. 2020) ................................................................25

*In re LifeUSA Holding, Inc.*,
    242 F.3d 136 (3d Cir. 2001) ................................................................45

*Love* v. *Johanns*,
    439 F.3d 723 (D.C. Cir. 2006).............................................................17

*National ATM Council, Inc.* v. *Visa Inc.*,
    7 F. Supp. 3d 51 (D.D.C. 2013) ..........................................................10

*In re Nexium Antitrust Litigation*,
    777 F.3d 9 (1st Cir. 2015) ...................................................................25

*Osborn* v. *Visa Inc.*,
    797 F.3d 1057 (D.D.C. 2015) ..............................................................10

*In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869*,
    292 F. Supp. 3d 14 (D.D.C. 2017) ..................................................24, 30

* *In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869 (Rail Freight I)*,
    725 F.3d 244 (D.C. Cir. 2013)................... 17, 18, 19, 22, 23, 25, 29, 30, 31, 41

* *In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869 (Rail Freight II)*,
    934 F.3d 619 (D.C. Cir. 2019)............................. 17, 20, 21, 22, 24, 25, 30, 45

*Tyson Foods, Inc.* v. *Bouaphakeo*,
    577 U.S. 442 (2016).............................................................................21

* Authorities upon which we chiefly rely are marked with asterisks.

Cases—continued:                                                    Page

*Visa Inc.* v. *Osborn,*
   136 S. Ct. 2543 .................................................................................11

*Wal-Mart Stores, Inc.* v. *Dukes,*
   564 U.S. 338 (2011)..........................................................................20

*West Virginia Association of Community Health Centers, Inc.* v.
   *Heckler,*
   734 F.2d 1570 (D.C. Cir. 1984)........................................................47

## STATUTES

15 U.S.C. § 1 ...............................................................................9, 10

28 U.S.C. § 1292(e)..............................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1337 ..................................................................................1

## RULES

Fed. R. Civ. P. 23(a)...........................................................................19

Fed. R. Civ. P. 23(b)(2)................................................................11, 20

* Fed. R. Civ. P. 23(b)(3) ....... 2, 11, 14, 15, 16, 19, 20, 23, 25, 31, 33, 37, 41, 45, 46

Fed. R. Civ. P. 23(f) ...........................................................1, 14, 15, 17

## MISCELLANEOUS

Federal Judicial Center, *Reference Manual on Scientific Evidence*
   (3d ed. 2011) ................................................................................39

James Hamilton, *Bivariate Granger Causality Tests,* Time Series
   Analysis (1994) .............................................................................40

* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

| TERM OR ABBREVIATION | DEFINITION |
| --- | --- |
| Acquiring bank | The bank or financial institution that maintains a relationship with an ATM network, enabling ATMs to communicate with issuing banks for purposes of foreign ATM transactions. |
| Acquirer fee | A fee that the acquiring bank generally pays to the ATM network in a foreign ATM transaction. |
| ATM | Automated Teller Machine |
| ATM network | The entity that creates a connection between the issuing bank and the acquiring bank for purposes of foreign ATM transactions. |
| ATM operator | A financial institution (*e.g.*, bank or credit union) or an independent entity that operates one or more ATMs. |
| Bank ATM | An ATM operated by a bank. |
| Cardholder | A consumer with an ATM card. |
| Foreign ATM transaction | An ATM transaction at an ATM not operated by the cardholder's issuing bank. |
| Independent ATM | An ATM that is not owned by a financial institution. |

| | |
|---|---|
| Interchange fee | A per-transaction fee that the issuing bank generally pays to the acquiring bank in a foreign ATM transaction. |
| Issuing bank | A financial institution that provides ATM cards to consumers. |
| JA | Joint Appendix |
| Net interchange | The interchange fee reduced by the acquirer fee for a given foreign ATM transaction. |
| Surcharge | A fee that the cardholder may pay to the ATM operator in a foreign ATM transaction. |
| Switch fee | A fee that the issuing bank generally pays to the ATM network in a foreign ATM transaction. |

## STATEMENT OF JURISDICTION

These consolidated appeals arise from the district court's August 4, 2021, decision that granted plaintiffs-appellees' motions for class certification. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. On August 18, 2021, defendants-appellants timely filed a petition to appeal under Federal Rule of Civil Procedure 23(f). On October 1, 2021, this Court granted the petition and permitted this appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(e) and Rule 23(f).

## STATEMENT OF THE ISSUE

Whether Federal Rule of Civil Procedure 23 and this Court's precedent require a district court to scrutinize the record and deny class certification where, as here, plaintiffs cannot prove, through common evidence, that all or virtually all of the putative class members were injured by the challenged conduct.

## STATEMENT OF THE CASE

These consolidated appeals involve three antitrust lawsuits challenging Visa's and Mastercard's ATM network rules that prevent ATM operators from imposing discriminatory fees on consumers who withdraw cash through Visa's or Mastercard's ATM networks. Plaintiffs seek certification of three proposed classes—two involving cardholders who withdrew cash from ATMs, and one

(1)

involving non-bank entities that operate ATMs. Contrary to this Court's precedent, the district court certified these proposed classes. The court did so despite a record replete with evidence that establishes that the putative classes sweep in substantial numbers of uninjured class members. And it did so notwithstanding plaintiffs' inability to exclude uninjured class members and meet the predominance requirement under Federal Rule of Civil Procedure 23(b)(3). This Court should vacate that erroneous decision and remand with instructions to deny the motions for class certification.

At class certification, plaintiffs must show that they can prove classwide injury using common proof. They failed to do so. Plaintiffs' models of injury relied on assumptions that all class members were injured. Visa and Mastercard rebutted those assumptions with expert analyses of real-world evidence. Yet, contrary to this Court's precedent, the district court did not scrutinize that evidence. The district court made no finding as to whether (or how) plaintiffs could prove common injury without sweeping in uninjured class members. Rather, the court concluded only that plaintiffs' theories of classwide injury were "colorable," and that any determination regarding the existence or number of uninjured class members was a "merits" issue. It thus certified in error three classes of plaintiffs that, according to the evidence in the record, are unable to meet the predominance requirement under Rule 23(b)(3).

When properly scrutinized, the evidence in the record precludes certification. In all three cases, plaintiffs' own economic models and theories of injury demonstrate that the proposed classes sweep in, and plaintiffs cannot exclude, significant numbers of uninjured class members. In the two cases involving consumer plaintiffs, Visa and Mastercard used data for a single issuing bank's cardholders to identify at least 50,000 uninjured class members. The third proposed class, involving ATM operator plaintiffs, necessarily contains—by definition—a substantial number of uninjured class members. No appellee class offered a reliable winnowing mechanism capable of discerning the injured from the uninjured. No class, much less three, can be certified under these circumstances.

This Court should vacate the district court's erroneous certification decision. And, in light of the unrefuted evidence of plaintiffs' inability to show predominance as a matter of law, the Court should remand these consolidated cases to the district court with instructions to deny plaintiffs' motions for class certification.

**A.    Background**

1.    Visa and Mastercard own and operate networks that allow consumers to withdraw cash from their bank accounts using ATMs. *See* JA3980. To withdraw cash, consumers use either an ATM terminal operated by the bank that issued their payment card (their "issuing bank") or they complete a

"foreign" transaction at an ATM operated by a different entity.  JA3649.

To complete a foreign transaction, the ATM terminal communicates with the consumer's issuing bank through an ATM network, such as those owned and operated by Visa and Mastercard.  *See* JA3649-3650.  The ATM network provides technical services enabling the transaction participants to communicate in real time, and it establishes operating rules and default fees that apply to each network transaction.  *See* JA6489-6490.  Many ATM networks compete for foreign ATM transactions.  Those networks include Visa's Visa/Plus network, Mastercard's Cirrus network, STAR, NYCE, PULSE, SHAZAM, Accel, and Credit Union 24.  *See* JA3980.

When completing a foreign ATM transaction, a consumer may use either an ATM operated by a bank other than the consumer's issuing bank (a "bank ATM") or an ATM operated by an independent entity that is not a bank (an "independent ATM").  *See* JA3648-3649.  To gain access to any ATM network at its terminals, an independent ATM operator must contract with a bank that maintains a relationship with that network, known as the ATM operator's "acquiring bank."  For bank ATMs, the bank that operates the ATM is also the acquiring bank.  JA3648-3650.

By way of illustration, named plaintiff Andrew Mackmin alleges that he has an ATM card issued by Bank of America, which he has used to withdraw cash from a Citibank ATM.  *See* JA174.  When Mr. Mackmin put his card into

the Citibank ATM, the acquiring bank (Citibank) communicated with the issuing bank (Bank of America) through an ATM network to provide Mr. Mackmin access to cash from his Bank of America account.  Similarly, named plaintiff Peter Burke alleges that he has an ATM card issued by Salem Five Bank that he has used at independent ATMs.  *See* JA481.  When Mr. Burke put his card into an independent ATM, an operator of that ATM would have contracted with an acquiring bank (*e.g.*, MetaBank) to communicate, through an ATM network, with the issuing bank (Salem Five Bank).

Foreign ATM transactions thus involve several participants, including: (i) the cardholder; (ii) the issuing bank; (iii) the ATM operator; (iv) the acquiring bank (for bank ATMs, the same bank as the ATM operator; for independent ATMs, a different entity); and (v) the ATM network that links the ATM's acquiring bank with the cardholder's issuing bank.  *See* JA3648-3649.  Some foreign transactions at independent ATMs may involve even more entities, such as:  processors, which enable independent ATMs to become technologically capable of facilitating ATM transactions; owners of the premises where the ATM terminals are located; money loaders, who replace the currency inside the ATMs; and independent sales organizations, which provide transaction processing and other services to affiliated independent ATM operators, among others.  *See* JA6514.

2.    Foreign ATM transactions involve a number of fees paid by and to

the various participants described above. *See* JA3652. Some of those fees, discussed below, are relevant for purposes of these appeals.[1]

*First*, the issuing and acquiring banks may pay a per-transaction fee to the ATM network. Specifically, a "switch fee" may be charged to the issuing bank and an "acquirer fee" may be charged to the acquiring bank. *See* JA3652, JA6490. ATM networks independently set switch and acquirer fees, so those fees vary depending on the network over which a transaction is directed (or "routed"). *See, e.g.*, JA4370-4371. ATM networks may also negotiate terms with issuing banks or acquiring banks to eliminate or reduce those fees. *Id.*

*Second*, the issuing bank generally pays a per-transaction "interchange fee" to the acquiring bank for providing ATM access to the issuing bank's cardholder. *See* JA3841. Absent an agreement between the issuing bank and the acquiring bank, the issuing bank pays a "default" interchange fee set independently by each ATM network for transactions routed over that network. *See* JA3841, JA4014. Although ATM networks set those default interchange fees, they do not retain any part of the interchange fees. Rather, the fee is collected from the issuing bank and paid to the acquiring bank. *See* JA3711, JA4014. The interchange fee that the acquiring bank receives from the issuing

---

[1] A graphical depiction of the participants and fees involved in a foreign ATM transaction is presented in Figure 3 of the report of defendants' industry expert. *See* JA6481.

MATERIAL UNDER SEAL DELETED

bank, reduced by the acquirer fee that the acquiring bank pays to the ATM network, is sometimes called "net interchange." JA6480.

*Third*, the cardholder may pay one or more fees for initiating a foreign ATM transaction. As relevant to this appeal, foreign ATMs often charge cardholders a "surcharge" for use of their terminals. *See* JA3650. The operator-side entities involved in setting the surcharge for any given ATM vary based on the contractual arrangements supporting that terminal. *See* JA6520-6522. In some cases, those arrangements provide that one entity (*e.g.*, the ATM processing services provider) sets the surcharge, but a different entity (*e.g.*, the ATM cash loader) retains all or a portion of the surcharge revenue. *Id.* Surcharges vary widely and tend to be higher where consumers have limited cash withdrawal options, such as in airports or outside of city centers. *See* JA4411-4412. Surcharges charged by foreign ATMs have increased steadily over time, regardless of whether net interchange has increased, decreased, or remained level. *See* JA6532-6534. Some issuing banks offer programs to reduce or reimburse ATM surcharges for certain customers. *See* JA6504, JA6507-6509. Those policies vary from bank to bank, and from cardholder to cardholder within an issuing bank. *See* JA6507-6510.

3.     Most ATM networks, including Visa/Plus, Cirrus, ███████, and others, have rules prohibiting an ATM operator from imposing a surcharge on transactions routed over their networks that exceeds the surcharge

MATERIAL UNDER SEAL DELETED

applied to transactions routed over competing networks. *See* JA4489. Those rules are known as non-discrimination rules. Only the Visa/Plus and Cirrus non-discrimination rules are being challenged in these lawsuits; the relief sought here would not remove the materially identical rules of other competing ATM networks.

ATM network non-discrimination rules have existed for decades. In the early 1980s, when ATM networks were beginning to develop in the United States, ATM networks generally prohibited ATM operators from levying any surcharges on consumers. *See* JA3845, JA4015. In the late 1980s and early 1990s, ATM acquiring banks and state governments pressured ATM networks to lift their surcharge bans. *See* JA3845-3846. ███████████, then the leading ATM networks, modified their surcharging rules to permit surcharging as long as the surcharges did not discriminate by network. *See* JA4570. In turn, Visa/Plus and Cirrus—which then each processed only between 3% and 5% of foreign ATM transactions in the United States, *see* NAC Dkt. No. 91 ¶ 8—followed those (and other) larger networks by permitting surcharging on a non-discriminatory basis. *See* JA4112. The continued prevalence of those rules is not surprising: they provide consumers the lowest available surcharges for cash withdrawals and limit price gouging and confusion at ATMs.

To this day, most ATM networks maintain non-discrimination rules. In fact, some ATM networks have implemented even stronger surcharge rules

8

called uniform surcharging rules—requiring operators to apply a *uniform* surcharge to all transactions, regardless of network. *See, e.g.*, JA4706.

### B.    Procedural History

1.    Appellees are three separate groups of plaintiffs who challenge Visa's and Mastercard's non-discrimination rules. The Consumer Plaintiffs (the *Mackmin* Plaintiffs and the *Burke* Plaintiffs) are two groups of individual cardholders who paid surcharges for foreign transactions at bank ATMs and at independent ATMs, respectively. The Operator Plaintiffs are several non-bank, independent ATM operators.[2]

In 2011, those three groups filed separate putative class actions in the United States District Court for the District of Columbia, alleging that the Visa/Plus and Cirrus non-discrimination rules violate Section 1 of the Sherman Act, 15 U.S.C. § 1. *See* JA1, JA68, JA107; *see also* JA161-164, JA209-213, JA511-512. The Consumer Plaintiffs also allege that the non-discrimination rules violate state antitrust, consumer protection, and unfair competition laws. *See* JA214-248, JA512-519.

According to the complaints, bank and independent ATM operators

---

[2] The Operator Plaintiffs also include a trade association of independent ATM operators. Because that association did not join Operator Plaintiffs' motion for class certification, it is not among the appellees in these consolidated appeals.

would have adopted "differential surcharging" in the absence of the non-discrimination rules. In other words, ATMs allegedly would have set their surcharges at different amounts depending on the ATM network used for the transaction. *See* JA148-150, JA192-193, JA488-491. Under plaintiffs' theory, bank and independent ATM operators would have lowered surcharges on transactions processed over networks with higher net interchange. *See, e.g.,* JA488-489. ATM networks, in turn, supposedly would have responded by increasing net interchange, to avoid discrimination in the form of higher surcharges on their network transactions. *See* JA150-151, 194-195, 489-490. All of the complaints seek treble damages and an injunction eliminating or barring enforcement of Visa's and Mastercard's non-discrimination rules—all the while leaving in place the rules of competing ATM networks. *See* JA165, JA248, JA518.

2. On December 19, 2013, the respective complaints were dismissed by the district court for failing to allege facts sufficient to establish Article III standing and failing to state a claim under Section 1 of the Sherman Act. *See National ATM Council, Inc.* v. *Visa Inc.*, 7 F. Supp. 3d 51, 52 (D.D.C. 2013). In August of 2015, this Court vacated the dismissals. *See Osborn* v. *Visa Inc.*, 797 F.3d 1057, 1062 (D.D.C. 2015). Visa and Mastercard filed a petition for a writ of certiorari in January of 2016, which the Supreme Court granted. *See*

10

*Visa Inc.* v. *Osborn*, 136 S. Ct. 2543.  Later that year, however, the Court dismissed certiorari as improvidently granted.  *See* 137 S. Ct. 289.

On remand to the district court, the cases proceeded.  For more than a year, the parties engaged in combined class and merits fact discovery, including depositions of more than twenty-five witnesses.  Fact discovery concluded in December of 2019.  Class discovery concluded in October of 2020.

3.    In September of 2019, all three plaintiff groups moved for class certification.  Consumer Plaintiffs sought to certify Rule 23(b)(2) and Rule 23(b)(3) classes of consumers who allegedly paid surcharges for foreign ATM transactions.  *See* JA1856, JA1908, JA3169-3170.  Operator Plaintiffs sought to certify, under Rule 23(b)(3), a class of all independent ATM operators with surcharged foreign transactions over the Visa/Plus or Cirrus networks.  *See* JA520-522, JA3340.  In February of 2020, Visa and Mastercard opposed certification.  Defendants submitted expert analyses of real-world evidence showing that none of the three proposed classes could establish classwide injury with common evidence; that, under plaintiffs' models of injury, each proposed class included many uninjured members; and that each class had offered no reliable mechanism to winnow out uninjured class members.  *See* JA6514-6515, 6677-6678.

a.    Specifically, Consumer Plaintiffs alleged that net interchange would have been higher absent Visa's and Mastercard's rules, and claimed that

11

MATERIAL UNDER SEAL DELETED

they could prove classwide injury based on common evidence that ATM operators impose higher surcharges on consumers in response to reductions in net interchange. *See* JA1891-1899, JA3215-3223. To support their argument, Consumer Plaintiffs' experts theorized that there is a "one-to-one" statistically significant relationship between net interchange and surcharge levels, and relied on that assumed relationship to build their models of injury. *See* JA3098-3099, JA3120, JA3254-3255. Only the *Mackmin* Plaintiffs' expert examined any surcharging data from any ATM operator in the opening reports, and he only looked at data from a single operator (████████). *See* JA3108-3110.

Yet, Visa and Mastercard's expert demonstrated with irrefutable, real-world data that plaintiffs' theory of injury did not hold true for many ATMs from which Consumer Plaintiffs withdrew cash. *See* JA6631, JA6676-6678. Specifically, as to several bank-owned ATMs used by *Mackmin* Plaintiffs, such as the ATMs of ████, the data showed no statistically significant relationship between surcharges and net interchange. *See* JA6677; *see also* JA8392-8394. Indeed, a number of banks did not increase surcharges at all during a time period in which net interchange fell. *See* JA6677. Likewise, the evidence showed no meaningful statistical relationship between surcharges and net interchange for a number of the largest independent ATM operators (relevant to *Burke* Plaintiffs). *See* JA6677-6678. And, as with bank operators, many independent operators did not increase surcharges at all during a time

12

period in which net interchange decreased. *Id.* This evidence thus demonstrated that Consumer Plaintiffs failed to carry their burden to establish predominance. Based on Consumer Plaintiffs' own theories of injury, cardholders who withdrew cash only from ATMs that did not raise surcharges in response to changes in net interchange were not and could not have been injured by the challenged rules. *See* JA3098-3099, JA3120-3121, JA3254-3255. Consumer Plaintiffs' putative classes, therefore, swept in significant numbers of uninjured cardholders.

b.      Operator Plaintiffs alleged that Visa's and Mastercard's rules resulted in supra-competitive acquirer fees, causing all members of their proposed class to suffer an overcharge injury. *See* JA3384-3385. But Operator Plaintiffs' proposed class definition included entities that do not directly or indirectly pay acquirer fees, or otherwise receive or pay any components of net interchange. *See* JA6810-6812; *see also* JA6514-6515. Reductions in net interchange, by definition, did not injure those class members.

4.      The district court (Leon, J.) granted plaintiffs' motions for class certification. Writing that "plaintiffs, at this stage of the proceedings, need[ed] only demonstrate a colorable method by which they intended to prove classwide impact," the district court characterized Visa and Mastercard's evidence demonstrating plaintiffs' inability to exclude substantial numbers of uninjured class members as a "merits" question. JA583. Satisfied that plaintiffs had

offered "colorable" and "reasonable" methods by which they "intended to prove" classwide injury, the court declined to scrutinize plaintiffs' theories of injury or defendants' evidence any further. JA583-585. The district court acknowledged defendants' argument that the methodologies plaintiffs offered to prove classwide impact were "hopelessly flawed." JA583-584. But the court erroneously did not address that critique or the evidence that supported it, concluding instead that it was "better suited" for adjudication "on the merits, not at the class certification stage." *Id.*

5.      On August 18, 2021, Visa and Mastercard timely filed a petition for an interlocutory appeal under Federal Rule of Civil Procedure 23(f). By order dated October 1, 2021, this Court granted the petition and permitted this appeal.

## SUMMARY OF ARGUMENT

Under this Court's clear precedent, the district court should not have certified these classes under Rule 23(b)(3). Prior to certifying a class, district courts must take a hard look at whether plaintiffs' injury models can prove classwide injury through common proof. The district court did not conduct that scrutiny here, improperly deferring it to the "merits" stage. When the record is reviewed, however, the unrefuted evidence shows that plaintiffs' injury models sweep in and cannot exclude substantial numbers of uninjured class members. Plaintiffs have therefore failed to establish a method for proving classwide injury through common proof. As a matter of law, plaintiffs cannot satisfy the stringent predominance requirement. Accordingly, this Court

14

should vacate the district court's Rule 23(b)(3) certification decision and remand with instructions to deny class certification.

I.    As a threshold matter, the motions panel correctly decided that interlocutory review is warranted under Rule 23(f).  Review is appropriate because the district court's ruling is manifestly erroneous in light of this Court's recent precedent, and because (as the motions panel concluded) the district court's decision is at least questionable and places substantial pressure on defendants to settle independent of the merits of the plaintiffs' claims.

II.    The district court erroneously deferred to the merits stage the rigorous inquiry into classwide injury that is a prerequisite of class certification.  According to the district court, all that plaintiffs needed to show was a colorable and workable method with which, in theory, they intended to prove classwide injury and establish predominance under Rule 23(b)(3).  But the district court was wrong because this Court's precedent requires more.  The district court must, at the certification stage, scrutinize defendants' evidence challenging plaintiffs' proposed methods for proving classwide injury.  The district court had to determine whether plaintiffs met their burden of offering a method capable of showing that all or virtually all class members were injured.  That analysis cannot be deferred to the merits stage of the litigation.  By holding that it could, the district court erred.

III.    The unrebutted evidence in the record precludes certification of any class here.  All of plaintiffs' models of injury sweep in, and cannot exclude,

significant numbers of uninjured class members. Consumer Plaintiffs presented models of injury that hinge on the existence of a statistically significant relationship between surcharge and net interchange. But Visa and Mastercard used real-world evidence to demonstrate that, for many ATMs, plaintiffs' own regression analysis shows that no such relationship exists. Accordingly, under Consumer Plaintiffs' own theory of injury, class members who withdrew cash solely from those ATMs are not injured. Similarly, Operator Plaintiffs presented a model of injury that hinges on the payment of acquirer fees. But Visa and Mastercard showed that many putative class members are entities that did not pay acquirer fees, either directly or indirectly. In other words, Operator Plaintiffs' injury model assumes injury with respect to many class members that, under plaintiffs' own theory of injury, were not injured at all. What is more, none of the plaintiffs offered any winnowing mechanism capable of identifying and excluding uninjured class members through common proof. Those shortcomings foreclose class certification as a matter of law.

Where an element of Rule 23 has not been met, and demonstrably cannot be met, courts of appeals vacate and remand to the lower courts with instructions to decertify the class. With class and fact discovery complete, and in light of the unrebutted evidence in the record that precludes predominance as a matter of law, this Court should do the same. The district court's certification order should be vacated and the cases remanded with instructions to deny plaintiffs' motions for class certification under Rule 23(b)(3).

## STANDARD OF REVIEW

This Court reviews a class certification decision "to ensure against abuse of discretion or erroneous application of legal criteria." *DL* v. *District of Columbia*, 860 F.3d 713, 724 (D.C. Cir. 2017) (citation omitted); *see In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869 (Rail Freight II)*, 934 F.3d 619, 624 (D.C. Cir. 2019). The Court applies "de novo" review to legal questions, including whether a district court has applied the correct legal standard to determine if plaintiffs have satisfied the Rule 23 class certification requirements. *Love* v. *Johanns*, 439 F.3d 723, 731 (D.C. Cir. 2006).

## ARGUMENT

## I.      INTERLOCUTORY REVIEW IS WARRANTED

The motions panel correctly determined that this appeal should be permitted under Rule 23(f). This Court may exercise jurisdiction under Rule 23(f) over an interlocutory appeal from a class certification decision if that decision (1) is "manifestly erroneous"; (2) is "questionable" and accompanied by a "death-knell"—*i.e.*, it places "substantial pressure on the defendant to settle independent of the merits of the plaintiffs' claims"; or (3) "presents an unsettled and fundamental issue of law relating to class actions." *In re Rail Freight Fuel Surcharge Antitrust Litigation-MDL No. 1869 (Rail Freight I)*, 725 F.3d 244, 250 (D.C. Cir. 2013) (quoting *In re Lorazepam & Clorazepate Antitrust Litigation*, 289 F.3d 98, 105 (D.C. Cir. 2002)).

The decision below was manifestly erroneous. This Court has made

clear that prospective classes must do more than demonstrate a "plausible" or "workable" method to prove classwide injury. *Rail Freight I*, 725 F.3d at 255. Contravening that precedent, the decision below certified three classes after finding that each presented a "colorable" and "reasonable" method to show classwide injury. JA583. Notwithstanding the undisputed evidence that each putative class is unable to exclude (and, in fact, includes) a large number of uninjured class members, the court erroneously declined to take a "hard look" at plaintiffs' models, *Rail Freight I*, 725 F.3d at 255, and instead deferred that issue to "the merits" stage, JA583-584.

Given that error, the motions panel of this Court correctly concluded that the decision below was "*at least*[] questionable" and accompanied by a potential death knell. Per Curiam Order 1, No. 21-8005 (emphasis added) (internal quotation marks omitted). Plaintiffs' alleged damages, post-trebling, nearly exceed Visa's 2020 net income and constitute nearly 150% of Mastercard's, according to *Mackmin* Plaintiffs' own estimates. *See* Petition Reply 10, No. 21-8005; *see also* JA3122. The certification decision below, therefore, undoubtedly "generate[s] unwarranted pressure to settle nonmeritorious or marginal claims." *Rail Freight I*, 725 F.3d at 252 (citation omitted).

Accordingly, this panel should proceed to the merits of the parties' disputes over class certification.

## II. THE DISTRICT COURT ERRED BY CERTIFYING THREE CLASSES WITHOUT SCRUTINIZING THE EVIDENCE OF CLASSWIDE INJURY

The district court erred by certifying three classes without determining whether plaintiffs' models purporting to establish classwide injury swept in uninjured class members. This Court has held that, as part of the predominance inquiry, a district court must confirm that plaintiffs can exclude uninjured class members. And that must be done *before* any class can be certified. Because the district court failed to do so and erroneously deferred the issue of classwide injury to the merits stage, this Court should vacate the class certification order.

### A. Before Certifying A Class, Courts Must Determine Whether Uninjured Class Members Can Be Identified And Winnowed Out By Common Proof

1. Pursuant to Federal Rule of Civil Procedure 23, a class action may be certified only if the plaintiffs demonstrate both that their putative class satisfies the four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and that the proposed class action also fits into one of the categories listed in Rule 23(b). *See Amgen* v. *Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 460 (2013). Because each group of plaintiffs seeks certification under Rule 23(b)(3), they must show that "questions of law or fact common to the class predominate over any questions affecting only individual members." *Rail Freight I*, 725 F.3d at

19

249 (citing Fed. R. Civ. P. 23(b)(3)) (alteration omitted).[3]

To determine whether plaintiffs demonstrate predominance, courts must conduct an inquiry that often overlaps with the merits of the plaintiffs' claims. *See Rail Freight II*, 934 F.3d at 622-623. The Supreme Court has long recognized that Rule 23(b)(3) "requires the judge to make findings about predominance . . . before allowing the class" to be certified, and the extent to which that analysis overlaps with the merits simply "cannot be helped." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 351, 363 (2011). Because these are "stringent requirements," *American Express Co.* v. *Italian Colors Restaurant*, 570 U.S. 228, 234 (2013), and a plaintiff's burden is "demanding," *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 623-624 (1997), district courts must take a "close look" at the putative class and perform a "rigorous analysis," *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34-35 (2013).

The predominance inquiry tests whether any dissimilarity among class members can be resolved in a manner that is neither "inefficient [n]or unfair." *Amgen*, 568 U.S. at 470. In other words, courts must determine whether certifying the proposed class would lead to the inefficiency of "a line of thousands

---

[3] The Consumer Plaintiffs also sought certification under Rule 23(b)(2) for injunctive relief. *See* JA579-581. That portion of the district court's decision is not at issue on appeal.

of class members waiting their turn to offer testimony and evidence on individual issues." *In re Asacol Antitrust Litigation*, 907 F.3d 42, 51 (1st Cir. 2018). And they must also ensure that certification does not unfairly amount to "an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues" of injury-in-fact and causation. *Id.* at 51-52. Unless plaintiffs offer a mechanism "to avoid both inefficiency and unfairness," the predominance requirement is not met and the class cannot be certified without violating defendants' Seventh Amendment and due process rights. *Id.* at 52; *see also Rail Freight II*, 934 F.3d at 624 (citing *In re Asacol*, 907 F.3d at 51-54).

Accordingly, the evidence of predominance must be robust. Consistent with the requirements of the Seventh Amendment and due process, the evidence must be "sufficient to sustain a jury finding as to [liability] if it were introduced in each [plaintiff's] individual action." *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U.S. 442, 459 (2016). The logic of this standard is clear: if an unknown number of class members "in fact suffered no injury," then the court must identify them before putting the merits of the dispute before a jury, and the "need to identify those [uninjured] individuals will predominate" over any common questions. *In re Asacol*, 907 F.3d at 53. Otherwise, defendants would be deprived of their right to have a "meaningful opportunity to contest"

whether a class member was injured. *Id.* To establish predominance, therefore, plaintiffs must "show that they can prove, through common evidence, that *all* class members were *in fact* injured by the alleged conspiracy." *Rail Freight I*, 725 F.3d at 252 (emphasis added). "Without common proof of injury and causation, . . . plaintiffs cannot establish predominance." *Rail Freight II*, 934 F.3d at 623.

2.    This Court embraced those principles in the *Rail Freight* cases. There, the Court made clear that, *before* certifying a class action, district courts must scrutinize plaintiffs' ability to show classwide injury through common evidence. This Court also stressed that district courts must be satisfied that putative classes can exclude uninjured class members using common proof. And the Court emphasized that those findings must be made even when that analysis requires inquiry into the merits of the plaintiffs' claims.

In *Rail Freight I*, 725 F.3d 244 (2013), the plaintiffs offered a damages model that purported to show classwide injury, while the defendants argued before the district court that the damages model "detect[ed] injury where none could exist." *Id.* at 252. The lower court did not address that concern. Instead, it proceeded to certify the class because plaintiffs' models purporting to prove classwide injury were "plausible" and "workable." *Id.* at 250.

On appeal, this Court held that certification there was improper. The Court noted that the district court had "understandably relied on" persuasive

precedent that was later overruled by the Supreme Court following class certification, but prior to the appeal. *Rail Freight I*, 725 F.3d at 255 (citing *Behrend* v. *Comcast Corp.*, 655 F.3d 182, 204 n.13 (3d Cir. 2011), *rev'd*, 569 U.S. 27 (2013)). That intervening precedent, this Court recognized, "unsettled the law relating to class actions." *Id.* at 250-251. "It is now indisputably the role of the district court to scrutinize the evidence before granting certification," and to ensure that "common evidence" can "show [that] *all* class members suffered *some* injury." *Id.* at 252-253 (first emphasis added). In fact, "[i]f the damages model cannot withstand this scrutiny then, that is not just a merits issue"; it is a certification issue, and one that is not optional. *Id.* at 253. Rule 23(b)(3) "commands" that courts take "a hard look at the soundness of statistical models that purport to show predominance," for predominance cannot be satisfied simply by offering "*any* method of measurement . . . so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 254-255 (citation omitted). Put simply: "[n]o damages model, no predominance, no class certification." *Id.* at 253.

Accordingly, "[m]indful that the district court neither considered the damages model's flaw in its certification decision nor had the benefit of [the Supreme Court's] guidance," this Court "vacate[d] class certification and remand[ed] the case to the district court to afford it an opportunity to consider these issues in the first instance." *Rail Freight I*, 725 F.3d at 255. On remand,

the district court carefully applied this Court's guidance and denied class certification because the class lacked predominance. *See generally In re Rail Freight Fuel Surcharge Antitrust Litigation*, 292 F. Supp. 3d 14 (D.D.C. 2017). The district court found that plaintiffs' methodology measured no injury "for over 2,000 members of the proposed class," and that this failure "undermine[d] the reliability" of the plaintiffs' entire model. *Rail Freight II*, 934 F.3d at 620, 623.

In *Rail Freight II*, 934 F.3d 619 (2019), this Court affirmed the district court's decision. As the panel noted, "[e]ven assuming the model can reliably show injury and causation for 87.3 percent of the class, that still leaves the plaintiffs with no common proof of those essential elements of liability for the remaining 12.7 percent." *Id.* at 623-624. Because "[u]ninjured class members cannot prevail on the merits," the Court explained, "their claims must be winnowed away as part of the liability determination." *Id.* at 624. And "any winnowing mechanism [to identify uninjured class members] must be truncated enough to ensure that the common issues predominate, yet robust enough to preserve the defendants' Seventh Amendment and due process rights to contest every element of liability and to present every colorable defense." *Id.* at 625. When the plaintiffs have no "further way" to "segregate the uninjured from the truly injured" through common evidence, they cannot meet the predominance requirement. *Id.* (citation omitted).

Those Rule 23 principles are well settled. Outside of this jurisdiction, too, a class cannot be certified unless all or virtually all putative class members can show, through common proof, that they were in fact injured. *See, e.g., In re Lamictal Direct Purchaser Antitrust Litigation*, 957 F.3d 184, 194-195 (3d Cir. 2020); *In re Asacol*, 907 F.3d at 53-54; *Halvorson* v. *Auto-Owners Insurance Co.*, 718 F.3d 773, 778-779 (8th Cir. 2013); *Denney* v. *Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *Bell Atlantic Corp* v. *AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003).[4]

In short, Rule 23(b)(3) prohibits certification of any class unless the plaintiffs have met their burden of offering a model that can reliably show,

---

[4] Although some of those courts have permitted small percentages of uninjured class members within a certified class, *see In re Nexium Antitrust Litigation*, 777 F.3d 9, 24 & n.20 (1st Cir. 2015), this Court has not recognized any *de minimis* exception to predominance, noting instead that such an exception "appears inconsistent with [the] statement in *Rail Freight I* that the plaintiffs, to establish predominance, must 'show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy,'" *Rail Freight II*, 934 F.3d at 624 (quoting *Rail Freight I*, 725 F.3d at 252). Here, plaintiffs have not invoked (or preserved) any such exception, and instead persistently "insist[ed] that each member of the proposed class *was* injured." *Rail Freight II*, 934 F.3d at 624. Thus, as was the case in *Rail Freight II*, "this case does not present" the question of "how many individual adjudications are too many." *Id.* In any event, as explained *infra* at pp. 32-45, the abundant number of class members for whom individualized inquiries would be required in plaintiffs' three proposed classes is not *de minimis*.

25

through common proof, that all or virtually all class members have been injured—or, at the very least, that can fairly and efficiently distinguish the injured from the uninjured without devolving into individualized inquiries.

### B. Because The District Court Expressly Declined To Resolve The Issue Of Classwide Injury Until The Merits Stage, It Committed Reversible Legal Error

Before the district court, Visa and Mastercard presented evidence that plaintiffs' injury models sweep in, and cannot exclude, substantial numbers of uninjured class members. When it declined to determine whether plaintiffs had offered reliable mechanisms to assess classwide injury, the district court erroneously departed from this Court's clear precedent.

1.    In support of their class certification motions, plaintiffs offered economic models and expert theories on classwide injury.[5]

The *Mackmin* Plaintiffs' expert (Professor Dennis Carlton) theorized that all class members suffered an injury because all bank ATM operators pass on as increased surcharges any lost revenue resulting from reductions in net interchange. *See* JA3098-3099, JA3120. Professor Carlton purported to support this theory by analyzing data from a single bank ATM operator that appeared to increase surcharges during a seven-year period in which net interchange was decreasing. *See* JA3108-3110.

---

[5] Plaintiffs' theories are discussed in greater detail *infra* at pp. 33-34, 37-40, and 42.

The *Burke* Plaintiffs' expert (Dr. William Lehr) embraced the same theory of classwide injury, supporting his opinion with only economic theory and no data analysis. *See* JA3254-3255. He described reductions in net interchange as an "industry-wide tax" that allegedly induces independent operators to raise their surcharges. *Id.*

Lastly, Operator Plaintiffs' expert (Dr. Douglas Zona) theorized that all class members were injured because they were overcharged on acquirer fees for ATM transactions over the Visa/Plus and Cirrus networks. *See* JA624. Yet, Dr. Zona's hypothesis that all members of the Operator class paid acquirer fees was based on no data regarding which entities actually paid those fees. Instead, he assumed without support the truth of that hypothesis based on the fact that acquirer fees were assessed on Visa/Plus or Cirrus ATM transactions. *See* JA624-628.

2.    Visa and Mastercard's expert (Professor Glenn Hubbard) presented unrefuted evidence showing that these proposed methods to prove injury were flawed, because plaintiffs' injury models could not establish classwide injury and included thousands of uninjured class members. *See* JA6677-6678, JA6700-6701, JA6810-6812; *see also* JA8392-8394.[6]

Regarding the Consumer Plaintiffs, Professor Hubbard showed, using

---

[6] The details of Professor Hubbard's analyses are discussed *infra* at pp. 34-36, 37-39, and 42-43.

Consumer Plaintiffs' own methodology, that there was no statistically significant relationship between surcharges and net interchange for many ATMs. But plaintiffs' theory of injury hinges on the existence of such a relationship. Under plaintiffs' own definition of injury, therefore, cardholders who withdrew cash solely from those ATMs are not injured. *See* JA3098-3099, JA3120, JA3254-3255. Professor Hubbard identified significant numbers of class members who transacted solely with bank and independent operators that did not increase surcharges at their ATMs in response to, or following, decreases in net interchange. *See* JA6677-6678. Consumer Plaintiffs' injury models nevertheless identified injury for those class members where none can exist under their own theory.

Regarding the Operator Plaintiffs, Visa and Mastercard presented unrebutted evidence that the class definition includes multiple types of entities that do not directly or indirectly pay acquirer fees (*i.e.*, the alleged overcharge). *See* JA6700-6701; *see also* JA6514-6515, JA6810-6812. Those putative class members cannot be injured under the Operator Plaintiffs' theory. Individualized inquiry would be required to determine which class members paid acquirer fees and may have been injured, and which did not pay acquirer fees and therefore were not and could not have been injured. *Id.*

3.    The district court did not evaluate Visa and Mastercard's evidence showing plaintiffs' inability to exclude uninjured class members. The district

court, instead, erroneously stated that the relevant test was the plausibility of plaintiffs' models and not whether the plaintiff classes could, in fact, establish classwide injury using common proof. *See* JA583-585. Based on that errone-ous reasoning, the district court deferred the predominance analysis until a later stage of the proceedings. *Id.*

The court found that *Mackmin* Plaintiffs offered a "colorable and well-accepted methodology for class-wide resolution," while concluding that de-fendants' critiques were "better suited for adjudication . . . on the merits." JA584-585. Similarly, the district court deemed *Burke* Plaintiffs' methodology "sufficient at this stage," because it was "well-accepted" and supported by "significant scholarship." JA583-584. Scrutinizing the class any further, the district court held, would amount to an impermissible "adjudication of the mer-its" of the *Burke* Plaintiffs' claims. *Id.* And the district court decided that Operator Plaintiffs "met their burden" by demonstrating a "colorable method" with which they "intend[ed] to prove" classwide injury, writing that defend-ants' critiques instead "contest the merits" of plaintiffs' claims. JA585.

4. It was error to grant class certification on this basis. This Court has made clear that it is "indisputably" the district court's "role" to "scrutinize the evidence before granting certification." *Rail Freight I*, 725 F.3d at 253. For instance, the lower court in *Rail Freight* initially "certified the class under Rule 23 because plaintiffs had shown that [the expert]'s theory that injury-in-

29

fact was capable of common proof was plausible and that his regression models were workable." 292 F. Supp. 3d at 42 (internal quotation marks and citation omitted). But, as this Court held, that "is no longer enough." *Id.*

This Court clearly explained that, before certifying a class, district courts must determine whether plaintiffs "can prove, through common evidence, that *all* class members were *in fact* injured by the alleged conspiracy." *Rail Freight I*, 725 F.3d at 252 (emphasis added). At the certification stage, plaintiffs need not "demonstrate through common evidence the precise amount of damages incurred by each class member." *Id.* But they must offer "common evidence to show [that] all class members suffered *some* injury." *Id.* At the very least, plaintiffs must offer some "winnowing mechanism" to identify uninjured class members and "ensure that the common issues predominate." *Rail Freight II*, 934 F.3d at 625. In short, a plaintiff's model of injury must be able to exclude uninjured class members, and the district court must make that determination "even when doing so requires inquiry into the merits of the claim." *Rail Freight I*, 725 F.3d at 253 (internal quotation marks and citation omitted).

Here, however, there was no "hard look" or "scrutiny" of plaintiffs' models. Instead, the district court's review of the models focused only on whether they had offered "colorable," "reasonable," and "well established" means "by

30

which they intend to prove" classwide injury.  JA583.  The district court declined to hold any plaintiff class to the required standard, and instead ignored this Court's precedent out of a misplaced concern that the inquiry would bleed into the merits.  To the district court, in fact, that required inquiry was "better suited for adjudication of plaintiffs' injury and damages on the merits, not at the class certification stage."  JA584.  But the view that "the merits of the methodology . . . have no place in the class certification inquiry" has long been "[r]ejected" in no uncertain terms.  *Rail Freight I*, 725 F.3d at 253 (citation omitted).  No class certified under this erroneous legal standard—much less three classes—should be allowed to stand.

## III.  DENIAL OF CLASS CERTIFICATION IS REQUIRED BECAUSE EACH CLASS CANNOT EXCLUDE SIGNIFICANT NUMBERS OF UNINJURED CLASS MEMBERS

The record establishes that plaintiffs offered no common proof of classwide injury.  The unrefuted evidence shows that each of plaintiffs' injury models sweeps in substantial numbers of uninjured class members and provides no mechanism to exclude them.  It is undisputed that those uninjured class members cannot prevail on the merits.  Accordingly, none of the proposed classes can satisfy the Rule 23(b)(3) predominance requirement.  In similar circumstances, courts of appeals have held that a record like this one forecloses a finding of predominance, and thus instructed the district courts to deny class certification.  This Court should do the same.

31

### A. The Undisputed Evidence Demonstrates That Each Of The Three Putative Classes Cannot Identify And Exclude Uninjured Class Members Through Common Proof

Plaintiffs have failed to carry their burden of showing that their proposed models can establish that all (or virtually all) members of the three putative classes were injured by the challenged conduct. To the contrary, the record conclusively establishes that all three of the putative classes at issue sweep in, and are unable to exclude, substantial numbers of uninjured class members. In light of that failing, certification of these classes would necessarily result in either the inefficiency of countless individualized inquiries or the constitutionally infirm recovery for a substantial number of uninjured class members.

### 1. According to Mackmin's *own theory of injury, the proposed class includes a substantial number of uninjured members*

The *Mackmin* Plaintiffs theorized that all class members suffered an injury because all bank operators passed on their lost revenue resulting from decreases in net interchange to consumers in the form of increased surcharges. The *Mackmin* Plaintiffs picked one bank out of thousands, and used data from that *single* bank to purport to show a causal relationship between surcharges and net interchange. But defendants disproved that hypothesized causal relationship by applying the *Mackmin* Plaintiffs' own methodology to bank operators other than that one single bank. For many bank operators, there is no statistically significant relationship between surcharges and net

32

$$\boxed{\text{MATERIAL UNDER SEAL DELETED}}$$

interchange. The *Mackmin* Plaintiffs' own methodology thus demonstrates that their model does not detect, but rather erroneously assumes, classwide injury. Because the *Mackmin* Plaintiffs have no mechanism for excluding all (or virtually all) uninjured class members, no class can be certified under Rule 23(b)(3). On that basis, this Court should remand with instructions to deny certification.



     a.      The *Mackmin* expert (Professor Carlton) observed that ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ JA3107. Based on that observation, Professor Carlton hypothesized a causal link for all bank-operated ATMs—"a long-run inverse relationship between net interchange and surcharges." *Id.* Professor Carlton purported to test his hypothesis using data from a single bank ATM operator, ▉▉▉▉▉▉▉. JA3108-3110. According to Professor Carlton, a regression of that data showed a ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. JA3109-3110.

     Professor Carlton simply assumed, without any evidence, that the ▉▉▉▉ ▉▉▉▉ data was representative of *all* bank-operated ATMs. *See* JA3108-3110. Based on that unfounded premise, Professor Carlton concluded that, ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉ JA3110 He went on to opine that injury could be proven on a classwide basis by adopting that blanket assumption for all banks.

MATERIAL UNDER SEAL DELETED

Based on that unproven assumption, Professor Carlton purported to establish that *all* consumers who paid surcharges at *all* bank ATMs were injured by Visa's and Mastercard's challenged rules. *See* JA3108-3110.

b.     Visa and Mastercard's expert (Professor Hubbard) applied Professor Carlton's own regression to data covering bank operators other than ████████, and for many he found no statistically significant inverse relationship between surcharges and net interchange. In other words, plaintiffs' theory of injury is based on a causal relationship that does not exist classwide.

Specifically, Professor Hubbard applied Professor Carlton's own regression analysis to available data over the same time period that Professor Carlton used: from 2010 (███████████████████████████████████) to 2017 (the end-year of Professor Carlton's analysis of ██████████ data). JA6675-6676.[7] That data, however, was not limited to ██████████, but instead covered the ████████████████████████████████████████. *See* JA6675. ████████████████████████████████████████████████

---

[7] Hubbard's analysis was conducted using available data spanning three different time periods: 2010-2015; 2010-2014; and 2010-2017. The results using each time period were qualitatively the same. *See* JA6676.

For the first time in his reply report, Professor Carlton proposed that a different time period be used. But even his own results for 2007-2017 confirm what Professor Hubbard found: not all banks had a statistically significant inverse relationship between surcharges and net interchange at their ATMs. *See* JA8392-8394.

MATERIAL UNDER SEAL DELETED

██████████████████████████████████████████████████

████████████ JA6677.  Those banks accounted for ████████████

████████████ *Id.*  What is more, ████████████████████

did not increase their surcharges at all.  *Id.*

Professor Hubbard took the next step of identifying some of the signifi-cant numbers of uninjured class members that are swept in by the *Mackmin* model.  Using available transaction data from just one issuing bank (████), Professor Hubbard identified at least 50,000 cardholders who withdrew cash only from ATMs of banks that did not increase their surcharges at all.  *See* JA6691.  None of those class members could have been injured, for what plain-tiffs claim to be their injury never happened:  surcharges did not increase in response to reductions in net interchange.  Accordingly, under plaintiffs' own theory of injury, those consumers are not injured.  But Professor Carlton's model sweeps those consumers into the class nonetheless.

In sum, Professor Hubbard identified only the tip of a rather substantial iceberg of uninjured class members.  *First*, Professor Hubbard's analysis was limited to only the top 100 acquiring banks.  The analysis of the remaining thousands of acquiring banks would undoubtedly yield even more bank ATMs that did not increase surcharges in response to reductions in net interchange.  *See* JA6692.  *Second*, while Professor Hubbard conclusively identified over 50,000 uninjured class members, his analysis of issuing-bank data was limited

35

MATERIAL UNDER SEAL DELETED

to only one issuing bank (█████).  There are thousands of issuing banks and, as Professor Hubbard explained, a review of their data would undoubtedly yield substantial numbers of additional uninjured class members (*i.e.*, cardholders who used solely ATMs that did not increase surcharges in response to reductions in net interchange). *Id.* The tip of this iceberg alone compels denial of class certification.

The *Mackmin* Plaintiffs ignored both the tip and the actual iceberg. They offered no mechanism to winnow out the uninjured class members whose existence Professor Hubbard has demonstrated with real-world evidence. Their only response is to double-down on an *assumption* of injury based on a purportedly universal inverse relationship between net interchange and surcharge.  Professor Hubbard disproved Professor Carlton's assumption using Professor Carlton's own regression methodology:  it is not true that all banks increased ATM surcharges in response to reductions in net interchange. Many did not.  Because *Mackmin* Plaintiffs' injury model is unable to exclude hundreds of thousands of class members who are uninjured under plaintiffs' own definition of injury, it cannot satisfy the requirements of predominance.

### 2. The proposed Burke *class's injury model is also incapable of excluding uninjured class members*

The *Burke* Plaintiffs asserted a similarly flawed theory of injury:  independent ATM operators pass through decreases in net interchange revenue to consumers in the form of increased surcharges.  *See* JA3224-3255.  But, unlike

the *Mackmin* Plaintiffs, the *Burke* class did not even attempt to perform any statistical analysis to purportedly demonstrate classwide injury. Rather, the *Burke* Plaintiffs rely entirely on theoretical assumptions about how ATM markets should work based on a demonstrably flawed analogy between ATM transactions and taxes. Those assumptions do not hold true when tested against real-world data. The *Burke* class, therefore, cannot meet the Rule 23(b)(3) predominance requirement for the same reasons the *Mackmin* Plaintiffs cannot. And their belated attempts to empirically fix their work are unavailing. The *Burke* class, too, cannot be certified under Rule 23(b)(3). This Court should therefore remand with instructions to deny certification.

a.    The *Burke* Plaintiffs' expert (Dr. Lehr) initially offered a wholly theoretical approach to classwide injury: in a competitive market, the "forces of competition . . . drive prices [*i.e.*, surcharges] toward average costs [*i.e.*, reductions in net interchange]." JA3255. Based on that theoretical principle, Dr. Lehr speculated that there must have existed a one-to-one inverse relationship between net interchange and surcharges, and thus all consumers withdrawing cash at independent ATMs must have been injured. *See* JA3254-3255. Dr. Lehr did not test his theoretical hypothesis against any real-world data.

b.    Professor Hubbard tested Dr. Lehr's assumption empirically, and

<div style="border:1px solid black; display:inline-block; padding:4px">MATERIAL UNDER SEAL DELETED</div>

found no support for it. *See* JA6685.[8] Professor Hubbard evaluated available data for the 2010-2015 period, covering ███████████████████████ ████████████████████████████████████. *See* JA6677. He found that ████████████████████████████████████████████████ ██████████████████████████████████ *Id.* This translated into ██████████████████████████████ *Id.* Furthermore, ██████████████████ did not increase their surcharge at all. *Id.*[9]

The precise number of uninjured members of the *Burke* class, although large, remains unidentifiable and thus non-excludable under Dr. Lehr's approach. The *Burke* Plaintiffs defined injury as an inverse relationship between surcharge and net interchange. Yet Professor Hubbard showed that no statistically significant inverse relationship exists for many independent ATMs.

---

[8] Dr. Lehr did not offer any regression methodology of his own, so Professor Hubbard borrowed the regression method used by Professor Carlton and the *Mackmin* Plaintiffs. *See* JA6677.

[9] The variability of the contractual relationships that govern independent ATMs, as discussed *infra* at pp. 43-45 in connection with the Operator Plaintiffs, further underscores why Dr. Lehr's theory does not hold in the real world. Under those contractual relationships, the person or entity that sets the surcharge is often not the same as the person or entity that receives the surcharge or that receives the net interchange. *See, e.g.*, JA4319-4320, JA4409-4410, JA5031-5038, JA6105-6108, JA6116-6118, JA6120-6123, JA6125-6127, JA6521-6523. In other words, entities not affected by changes in net interchange often decide the surcharge amounts.

MATERIAL UNDER SEAL DELETED

Accordingly, cardholders who withdrew cash solely from those ATMs were not injured under plaintiffs' own definition of injury. The *Burke* Plaintiffs, however, offered no data with which to identify uninjured consumers or establish their number. As Professor Hubbard explained, the number of uninjured consumers that cannot be excluded from Dr. Lehr's model is inevitably significant, given the number of independent operators for which Dr. Lehr's assumption does not hold true and the volume of withdrawals from those operators. *See* JA6692.

      c.    In response to Professor Hubbard's fatal critique, the *Burke* Plaintiffs offered eleventh-hour empirical analysis from Dr. Lehr for the first time with their reply brief. But none of *Burke* Plaintiffs' belated evidence supports Dr. Lehr's assumption of classwide injury.

      *First*, Dr. Lehr attempted to support his hypothesis of universal classwide injury using data from a single independent ATM operator (███████) in a single market (Puerto Rico), limited to "cross-border" consumers who used cards issued outside of Puerto Rico. *See* JA7502-7507. But, like the *Mackmin* Plaintiffs' use of ███████ data, there is no evidence "that the ███████ data represent all or even most independent operators." JA8541. Indeed, the very specific, small, and non-representative nature of Dr. Lehr's selected dataset suggests just the opposite. *See* Federal Judicial Center, Reference Manual on Scientific Evidence 222-223 (3d ed. 2011).

MATERIAL UNDER SEAL DELETED

*Second*, Dr. Lehr attempted to prove the existence of his hypothesized one-to-one inverse relationship between net interchange and surcharge by performing a so-called "Granger Causality Test." JA7549-JA7551. But "it is well established among economists that Granger Causality Tests do not determine causality." JA8540. Those tests only "address the question of whether one variable can help *forecast* another variable," and "just because one variable is found to forecast another variable does not imply that changes in one variable *causes* changes in the other variable." *Id.*; *see also* James Hamilton, *Bivariate Granger Causality Tests*, Time Series Analysis 308 (1994) (because "one may be skeptical about [the] utility" of the Granger Causality Test "for establishing the direction of causation," it "seems best" not to "describe these as . . . tests of whether *y* causes *x*").

*Third*, Dr. Lehr attempted to replicate Professor Hubbard's analysis for a different timeframe (2007 to 2018). *See* JA7552. But even Lehr's analysis, using an arbitrarily selected timeframe, continued to show the absence of any statistically significant inverse relationship between surcharges and net interchange for at least ███████████ independent ATM operators. *Id.* Under plaintiffs' own theory of injury, class members who withdrew cash only from those operators' ATMs were not injured at all.

    d.    Like Professor Carlton's model, therefore, Dr. Lehr's model is in-

40

capable of showing classwide injury. It "detects injury where none could exist," because it merely assumes classwide injury. *Rail Freight I*, 725 F.3d at 252. It is indisputable that there are a substantial number of consumers who made cash withdrawals only at independent ATMs that did not increase ATM surcharges in response to reductions in net interchange. Under plaintiffs' own theory of injury, those consumers suffered no injury. Yet, the *Burke* Plaintiffs offer no mechanism, let alone a reliable one, to identify and winnow out those consumers from the putative class.

In the district court, plaintiffs made the vague suggestion that claims by uninjured class members could be "purged by the claim's administrator" after a trial on the merits. *See* JA7249. But that is no answer. Predominance is not met simply because "uninjured class members could be removed in a proceeding conducted by a claims administrator" after trial on the merits but before entering judgment. *In re Asacol*, 907 F.3d at 45.[10] In short, the *Burke* class cannot be certified under Rule 23(b)(3), and this Court should remand with that instruction.

---

[10] A claims administrator, in any event, could not systematically "purge" uninjured class members on the record below. That is because plaintiffs did not collect the necessary cardholder data from the thousands of banks that issued class members' cards, and independent ATMs are not identified with consistent operator names in issuer data. *See* JA6692.

MATERIAL UNDER SEAL DELETED

### 3. *The proposed Operator class necessarily includes uninjured members but offers no winnowing mechanism*

The proposed Operator class also includes uninjured class members, and again provides no common evidence to identify and exclude putative class members who were not injured. Put simply, the Operator class purports to find injury based solely on alleged overcharges in network acquirer fees. But many class members undisputedly paid no acquirer fees at all, and thus were not injured. Accordingly, the Operator class fails to meet the predominance requirement and cannot be certified. This Court should remand with instructions to deny certification.

a.    The Operator Plaintiffs claim classwide injury from acquirer fees that were allegedly inflated because of Visa/Plus's and Cirrus's non-discrimination rules. The Operators' expert (Dr. Zona) made two assumptions. *First*, that all putative class members "paid the same per transaction network acquirer fees between 2007 and 2018." JA628. *Second*, that "[t]here are no independent ATM Operators who did not pay the full acquirer fee at some point after 2007." *Id.* Based on those assumptions, Dr. Zona claimed that "all or substantially all" independent ATM operators in the Operator class were injured. JA606-607.

b.    Professor Hubbard once again tested plaintiffs' assumptions using real-world data. And, once again, he disproved them. Professor Hubbard found that ████████████████████████████████████████████████

42

MATERIAL UNDER SEAL DELETED

████████████████████████████████

████████████████. JA6701. Accordingly, the class includes a vast number of putative class members who "may *not* have paid acquirer fees" at all. JA6700. Under plaintiffs' own theory of injury, then, those class members are not injured.

The Operators responded that those putative class members might have, somehow, paid acquirer fees *indirectly* through a third party or through contractual cost-sharing arrangements. *See* JA6823-6826. But Operator Plaintiffs offered no common evidence to prove that speculative hypothesis of possible injury by some (but certainly not all) class members. Accordingly, any effort to identify which of the ███ putative class members actually might have paid acquirer fees for any given ATM transaction would defeat predominance. It would, in fact, require individualized inquiries into agreements, undertakings, and industry conventions governing each individual ATM operator and each ATM at issue. *See, e.g.*, JA4061-4064, JA5461, JA6108.

Moreover, record evidence proves that Operator Plaintiffs' hypothesis of classwide injury is wrong. Operator Plaintiffs defined the proposed class to include multiple types of entities that are involved in operating and servicing independent ATMs. Indeed, the Operator class includes "any person or entity that owned, operated, or leased a Qualified ATM that was authorized . . . to

43

originate an ATM Cash Disbursement through the connection of the Qualifying ATM to the Visa or Mastercard ATM networks," with certain exceptions. JA521. But multiple entities can satisfy this definition even for a single ATM. A single ATM may involve one entity that owns the ATM; another entity that instructs the processor about the features of the specific ATM; and yet another entity that manages the initial setup and holds encryption keys for the terminal. *See* JA4313-4314, JA6812, JA6514-6515, JA8478-8485, JA8500-8501. Each one of those entities would be an "independent ATM operator" under the class definition.

Given the complex and variable business arrangements between those entities, some do not directly or indirectly pay acquirer fees, nor do they receive or pay any components of net interchange. But they all meet the class definition here. *See* JA4408-4410, JA5461, JA6018, JA6108, JA6131-6134. For example, a retail store may own an ATM on its premises, but may contract with an independent sales organization to connect its ATM to banks and payment networks. Under the store's agreement with the independent sales organization, the latter may be the only party responsible for receiving interchange revenue from, and paying acquirer fees to, the acquiring bank. But under the Operator Plaintiffs' class definition, the store itself is also an "Operator." *See* JA520-521, JA3337-3338, JA6514-6515, JA6810-6812.

In sum, Operator Plaintiffs cannot dispute that their methodology does

44

not exclude proposed class members that do not pay any components of the alleged overcharge in acquirer fees. Those class members, under plaintiffs' own definition of injury, are uninjured. The Operator class has failed to identify a reliable mechanism to use common proof to winnow out uninjured ATM operators who did not pay acquirer fees. *See Rail Freight II*, 934 F.3d at 625. The class cannot be certified, and the case should be remanded with that instruction.

**B.    The Court Should Vacate And Remand With Instructions To Deny Class Certification**

Even with a fully developed record, plaintiffs have failed to present common proof from which they can establish predominance as a matter of law. On remand, the undisputed evidence of plaintiffs' inability to exclude uninjured class members would foreclose certification as a matter of law. Accordingly, as other courts of appeals have done, this Court should instruct the district court to deny the class certification motions under Rule 23(b)(3).

Where "the requirement of predominance has not been met," appellate courts "will vacate [the order] which certified the plaintiff class . . . and remand th[e] case to the [d]istrict [c]ourt with instructions to decertify the class." *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 148 (3d Cir. 2001). Where, as here, settled principles of class action law establish that plaintiffs failed to meet one of the Rule 23 requirements, courts of appeals have also reversed erroneous certification orders. *See, e.g., Hudock* v. *LG Electronics U.S.A.,*

45

*Inc.*, 12 F.4th 773, 777 (8th Cir. 2021); *In re Asacol*, 907 F.3d at 58.

Given plaintiffs' inability to satisfy the predominance requirement, this Court should take a similar approach here. The Third Circuit's decision in *Ferreras* v. *American Airlines, Inc.*, 946 F.3d 178 (2019), is instructive. In that case, the district court certified a class of employees bringing claims for overtime wages against American Airlines. *Id.* at 180. American Airlines, however, argued on appeal that the district court "did not conduct a rigorous analysis," and that "several of the requirements of Rule 23, including common-ality and predominance, were not met." *Id.* The court of appeals agreed. The court held that "it was error for the [d]istrict [c]ourt to leave unresolved con-flicts in the evidence before it," including issues going to classwide injury, be-cause "[t]he rigorous analysis demanded by Rule 23 requires a court to resolve such disputes" at the class certification stage. *Id.* at 184. Given that "discovery was essentially complete" and the court of appeals' own "review of the record" showed that "it [was] clear that commonality and predominance [could not] be met," the court "reverse[d] rather than remand[ed]." *Id.* at 184-185.

For the reasons discussed *supra* at pp. 31-45, this Court should take a similar approach here.[11] Class discovery is complete. On this record, plaintiffs

---

[11] In these consolidated appeals, a reversal of the Rule 23(b)(3) certification decision is functionally equivalent to a vacatur and remand with instructions to deny the motions for class certification under Rule 23(b)(3).

46

cannot prove classwide injury using common proof because the unrefuted record evidence establishes that all three of the proposed classes sweep in and cannot exclude substantial numbers of uninjured class members. And no putative class has presented any methodology for identifying and excluding these uninjured class members using common proof. This Court should remand with instructions to deny the certification motions.

If, notwithstanding the fundamental flaws in plaintiffs' proposed methods of ascertaining classwide injury, the Court were to choose not to instruct the district court to deny the class certification motions, it should nevertheless retain jurisdiction over any subsequent appeals, "in the interest of judicial economy." *American Trucking Associations, Inc.* v. *E.P.A.*, 175 F.3d 1027, 1057 (D.C. Cir. 1999), *aff'd in part, rev'd in part on other grounds*, 531 U.S. 457 (2001) (citing *Sierra Club* v. *Gorsuch*, 715 F.2d 653, 661 (D.C. Cir. 1983)); *see also West Virginia Association of Community Health Centers, Inc.* v. *Heckler*, 734 F.2d 1570, 1580 (D.C. Cir. 1984). Retaining jurisdiction would provide the most efficient use of judicial resources given this panel's existing knowledge of the cases and the likelihood that an open-ended remand would result in another appeal by the losing party, triggering "the need for a new notice of appeal, briefing schedule, and reassignment to a new panel unfamiliar with the case." *Florez* v. *C.I.A.*, 829 F.3d 178, 189 (2d Cir. 2016).

## CONCLUSION

The district court's certification decision should be vacated and these cases remanded with instructions to deny the motions for class certification.

Respectfully submitted,

/s/ *Justin Anderson*

| | |
|---|---|
| MATTHEW A. EISENSTEIN | KENNETH A. GALLO |
| ROSEMARY SZANYI | JUSTIN ANDERSON |
| R. STANTON JONES | MITCHELL D. WEBBER |
| ARNOLD & PORTER KAYE | MATTEO GODI |
|   SCHOLER LLP | PAUL, WEISS, RIFKIND, |
| *601 Massachusetts Avenue, N.W.* |   WHARTON & GARRISON LLP |
| *Washington, DC 20001* | *2001 K Street, N.W.* |
| *(202) 942-5000* | *Washington, DC 20006* |
| | *(202) 223-7300* |

*Counsel for Appellants*
*Visa Inc.; Visa U.S.A. Inc.;*
*Visa International Service*
*Association; and Plus System, Inc.*

*Counsel for Appellants*
*Mastercard Inc. and Mastercard*
*International Inc.*

JANUARY 26, 2022

48

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Justin Anderson, counsel for Appellants Mastercard Inc. and Mastercard International Inc. and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g)(1), that the attached Brief of Appellants is proportionately spaced, has a typeface of 14 points or more, and contains 10,732 words.

/s/ *Justin Anderson*
JUSTIN ANDERSON
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.*
   *Washington, DC 20006*
   *(202) 223-7300*

JANUARY 26, 2022

## CERTIFICATE OF SERVICE

I, Justin Anderson, counsel for Appellants Mastercard Inc. and Mastercard International Inc. and a member of the Bar of this Court, certify that, on January 26, 2022, a copy of the attached Brief of Appellants, Public Copy, was filed with the Clerk through the Court's electronic filing system, which sent notice to all counsel of record.

/s/ *Justin Anderson*
JUSTIN ANDERSON
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.*
   *Washington, DC 20006*
   *(202) 223-7300*

JANUARY 26, 2022