# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

| | |
|---|---|
| **No. 21-7109** | **September Term, 2022** |
| | FILED ON: JULY 25, 2023 |

NATIONAL ATM COUNCIL, INC., ET AL.,
    APPELLEES

v.

VISA INC., ET AL.,
    APPELLANTS

---

Consolidated with 21-7110, 21-7111

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cv-01803)
(No. 1:11-cv-01831)
(No. 1:11-cv-01882)

---

Before: PILLARD, *Circuit Judge*, and EDWARDS and ROGERS, *Senior Circuit Judges*.

### J U D G M E N T

This case was considered on the record from the United States District Court for the District of Columbia and on the briefs and oral arguments of the parties. The court has afforded the issues full consideration and determined they do not warrant a published opinion. *See* D.C. CIR. R. 36(d). For the reasons stated in the memorandum accompanying this judgment, it is hereby

    **ORDERED AND ADJUDGED** that the judgment of the district court be **AFFIRMED**.

    Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

1

**Per Curiam**

                                        **FOR THE COURT:**
                                        Mark J. Langer, Clerk

BY:   /s/

        Daniel J. Reidy
        Deputy Clerk

*National ATM Council, Inc., et al. v. Visa Inc., et al.*, No. 21-7109

## MEMORANDUM

Mastercard and Visa operate networks that enable banks to communicate with automated teller machines (ATMs) operated by third parties. The Mastercard and Visa networks (CIRRUS and Plus) are enabled on nearly every debit card in circulation in the United States, and by some estimates, are used to process over half of all ATM transactions. Mastercard and Visa require that ATM operators seeking to use their networks agree to rules governing the "access fees" that ATMs may charge cardholders (the Access Fee Rules). A group of ATM operators, along with debit cardholders who were charged fees at bank and non-bank ATMs, filed class action lawsuits challenging those Rules as a violation of antitrust law. Three groups of plaintiffs sought class certification. The district court granted class certification, holding that each of the three proposed classes satisfied the requirement under Rule 23(b)(3) that common questions of law or fact predominate over individual ones. *See Nat'l ATM Council, Inc. v. Visa Inc.*, No. 11-cv-1803, 2021 WL 4099451, at *5-7 (D.D.C. Aug. 4, 2021). We affirm.

### I.

Cardholder access fees for ATM transactions were prohibited until the mid-1990s. As governments rolled back those bans, banks began to charge for ATM use and nonbank operators entered the ATM market. Banks developed ATM networks that allowed ATM operators—both different banks and nonbank (independent) ATM operators—to serve debit cardholders more interchangeably, without regard to whether the ATM is sponsored by the card-issuing bank. Cardholders gained the convenience of access to their accounts at ATMs other than their bank's—for a price. And the businesses involved in providing that access vied for shares of the profits.

In 1996, shortly after legal restrictions on ATM access fees were lifted, Mastercard and Visa developed the contract provision that is the focus of this antitrust case. Under that provision, ATM operators that participate in Mastercard's or Visa's network must abide by Access Fee Rules that prohibit them from charging cardholders lower access fees for transactions routed over other ATM networks than they charge for transactions over a Mastercard or Visa network. In other words, if an ATM operator is charged less by a non-Mastercard or Visa network, the contract provision bars that operator from passing a portion of those savings on to cardholders in the form of lower access fees. It is undisputed for current purposes that Mastercard and Visa exercise market power such that all ATM transactions at issue in this case are subject to the Access Fee Rules.

Plaintiffs claim the Access Fee Rules are an unlawful agreement "in restraint of trade" that violates Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. In their view, Mastercard and Visa have engaged in anticompetitive conduct by preventing bank and nonbank ATM operators alike from offering cardholders lower access fees for transactions routed over cheaper networks—and by blocking independent ATM operators from competing with bank-owned ATMs by charging cardholders less.

To apprehend the claimed antitrust violation underlying this class action suit, one must understand the standardized structure of a "foreign" ATM transaction—the only kind at issue here—and the various fees involved. A "foreign transaction" does not refer to anything international, but to a cardholder's use of an ATM not operated by the financial institution that issued the card. A foreign ATM transaction cannot proceed unless the card-issuing bank and the ATM terminal share an ATM network. In exchange for enabling the transaction, the ATM network charges the ATM operator a per-transaction usage fee, or "network fee" (also referred to in the record as an "acquirer fee"). The ATM operator, for its part, relies on two revenue streams: an "interchange fee" it charges the card-issuing bank for serving its card and a surcharge or "access fee" it charges each cardholder. The parties also speak in terms of "net interchange": the per-transaction amount of interchange revenue left to the ATM operator after it pays the network fee. As relevant here, high network fees depress ATM operators' net interchange revenues.

Mastercard and Visa charge higher network fees than their competitors, commonly referred to as "regional networks." ATM operators accordingly receive less net-interchange revenue on a transaction routed over a Mastercard or Visa network than if that same transaction used a regional network. But Mastercard or Visa networks are enabled on nearly every debit card in the United States, excluding government-issued electronic benefit transfer cards. More than half of all domestic ATM withdrawals are routed over Mastercard or Visa networks. Some banks issue debit cards that can complete transactions *only* over Mastercard or Visa ATM networks. Thus, an ATM operator that forgoes access to Mastercard and Visa ATM networks risks being unable to process transactions for, and earn revenue from, many banks and cardholders. It is unsurprising, then, that Mastercard and Visa networks have achieved near-universal acceptance at domestic ATMs—which is to say that the challenged contract provision affects virtually all ATM transactions, whether or not they are completed over Visa's or Mastercard's networks.

Given that Mastercard's and Visa's network fees are comparatively high, all else being equal, independent ATM operators would presumably favor ATM networks offering network service for less. And one might expect that an ATM operator seeking to expand its customer base would seek to attract customers whose transactions could be routed over lower-cost networks. An ATM operator could attract customers by engaging in "differential surcharging," that is, charging higher access fees for transactions routed over higher-cost networks like Visa's and Mastercard's—and sharing savings from use of regional networks with cardholders served via those lower-cost networks. If lower access fees were not barred by the Access Fee Rules, demand from customers seeking lower access fees, including those with cards currently limited to Mastercard's and Visa's networks, would presumably drive card-issuing banks to offer them via connections to networks other than Mastercard's and Visa's.

In sum, the ATM customer plaintiffs would benefit if independent ATM operators offered them account access for less. ATM Operator plaintiffs would benefit if they could earn more per transaction through network-fee savings, or if they could attract more customers and increase their volume of transactions by differentially charging lower ATM access fees to process transactions over less expensive ATM networks. But, Plaintiffs argue, the Access Fee Rules challenged here foreclose those benefits, obstruct competition, and cause them class-wide harm.

2

## II.

Three plaintiff groups filed parallel class-action suits against Mastercard and Visa (Defendants) claiming that the Access Fee Rules restrain competition in violation of Section 1 of the Sherman Act.  The ATM Operator Plaintiffs are entities who operate independent ATMs, *Burke* Plaintiffs are cardholders who were charged unreimbursed access fees at independent ATMs, and *Mackmin* Plaintiffs are cardholders who were charged unreimbursed access fees at bank-operated ATMs.  ATM Operators, *Burke* Plaintiffs, and *Mackmin* Plaintiffs (collectively, Plaintiffs) allege that cardholders pay inflated access fees because of Defendants' anticompetitive restrictions on ATM operators, and that those same restrictions prevent independent operators from using cardholder access-fee discounts to expand their own market share.

The district court consolidated the cases, and each plaintiff group moved for class certification.  As relevant here, Defendants opposed class certification on the ground that Plaintiffs had not shown common antitrust injury and thus failed to meet the predominance requirement of Rule 23(b)(3).  As we observed in a prior appeal of these cases, the three plaintiff groups advance distinct but complementary theories of antitrust harm.  *See Osborn v. Visa*, 797 F.3d 1057, 1064 (D.C. Cir. 2015).  ATM Operators claim that the Access Fee Rules' ban on differential surcharging enables Defendants to maintain artificially high network fees that eat into the ATM Operators' revenue.  They further claim that the Rules protect Visa's and Mastercard's high network fees from downward pressure that might otherwise be exerted if independent ATMs could compete for customers by charging lower access fees to use their machines to complete transactions over lower-cost networks.  According to the *Burke* and *Mackmin* plaintiffs, the artificially high network fees lead ATM operators to preserve profits by charging higher access fees to the cardholder class members than they would otherwise.  *Burke* Plaintiffs aim to show that Visa's and Mastercard's inflated network fees have price effects akin to those of a tax on the independent ATM operator industry—that is, they place upward pressure on the final price of the service, raising the access fee paid by the cardholder at the ATM terminal.  And *Mackmin* Plaintiffs seek to illustrate that effect with additional evidence that high network fees eat into the net revenue that bank ATM operators receive from other banks, which leads ATM operators to charge higher access fees.

The district court granted the motions and certified three classes, finding that each satisfied the requirements of Rule 23(a) and Rule 23(b)(3).  Defendants timely sought interlocutory review of the district court's class certification ruling.  We review that ruling for abuse of discretion.  *See Garcia v. Johanns*, 444 F.3d 625, 631 (D.C. Cir. 2006).  Under this standard, "we review a certification ruling 'conservatively'" to guard against "erroneous application of legal criteria" or unsupported assessments of evidence and will "affirm the district court even if we would have ruled differently in the first instance." *Id.* (quoting *Wagner v. Taylor*, 836 F.2d 578, 586 (D.C. Cir. 1987)); *see also Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014) ("A district court would necessarily abuse its discretion if it based its ruling . . . on a clearly erroneous assessment of the evidence." (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990))).

Mastercard and Visa argue that the district court failed to give a "hard" or "close look" at Plaintiffs' evidence or to perform a "rigorous analysis" as to whether Plaintiffs met the predominance requirement.  Appellants' Br. 18, 20 (quoting *In re Rail Freight Fuel Surcharge*

3

*Antitrust Litig.-MDL No. 1869* (*Rail Freight I*), 725 F.3d 244, 255 (D.C. Cir. 2013) and *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013)). And they assert that the district court "erroneously deferred the issue of classwide injury to the merits stage." *Id.* at 19; *see id.* at 30-31. They contend that the court thus abused its discretion in finding that Plaintiffs meet the Rule 23(b)(3) requirement that "questions of law or fact common to the class predominate over any questions affecting only individual members." *Id.* at 19 (quoting *Rail Freight I*, 725 F.3d at 249 (citing Fed. R. Civ. P. 23(b)(3))). Defendants assert that the evidence indisputably shows each class to contain uninjured members, *id.* at 36-41, and they fault Plaintiffs for not identifying a common "winnowing mechanism" to exclude them, *id.* at 42; *see id.* at 42-45.

Put simply, Mastercard and Visa contend that the district court did not reach its class certification ruling through rigorous analysis, and that Plaintiffs do not satisfy Rule 23(b)(3). We disagree and remand to the district court for further proceedings consistent with the order.

### III.

### A.

As a threshold matter, we confirm our discretionary jurisdiction over this appeal. *See* Fed. R. Civ. P. 23(f); 28 U.S.C. § 1292(e). In this circuit, we have jurisdiction over an interlocutory appeal when we deem it an appropriate exercise of our discretion to take an early look at a class certification decision that (1) is "questionable" and accompanied by a "death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims," (2) "presents an unsettled and fundamental issue of law relating to class actions," (3) is "manifestly erroneous," or (4) presents other "special circumstances" warranting immediate review. *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 99-100, 105 (D.C. Cir. 2002).

The certification decision does not pose an important and unsettled, class action-related legal question that we must resolve. Nor does it show manifest error by ignoring binding, on-point precedent. Manifest error in class certification decisions is "rare[] . . . simply because class actions typically involve complex facts that are unlikely to be on all fours with existing precedent." *In re Johnson*, 760 F.3d 66, 72 (D.C. Cir. 2014) (quoting *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005)); *see also In re Brewer*, 863 F.3d 861, 875 (D.C. Cir. 2017) (noting that "[t]he manifest error standard is extremely difficult to meet").

We nonetheless exercise our jurisdiction on the ground that the district court's certification decision is at least "questionable" insofar as its statements of law were not entirely clear, its citations were not current, and its record analysis was notably terse. *See Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *1-7. That is surprising and unfortunate given the breadth of the asserted unlawful practice, the amount of money asserted to be at stake, and the voluminous record including dueling expert reports. The district court quoted older, nonbinding district court decisions, and failed to cite the Supreme Court's most recent case analyzing when common issues predominate over individualized ones under the pertinent class action provision. *See id.* at *5-7 (citing *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) and *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 307 (D.D.C. 2007)). The district court's pronouncement that plaintiffs "need only demonstrate a colorable method by which they intend to

4

prove class-wide impact" and its citations to decades-old, nonbinding cases, *see id*. at *6 (citing *In re Vitamins*, 209 F.R.D. at 264), arguably are in tension with our recent guidance that Rule 23 "commands" the court to take a "hard look at the soundness of statistical models that purport to show predominance," *Rail Freight I*, 725 F.3d at 255.

The certification decision also could be the "death knell" of the litigation by focusing "irresistible pressure" on Defendants to settle rather than continue to litigate to a judgment on the merits. *Id.* at 251 (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1274 (11th Cir. 2000)). Indeed, several of Mastercard's and Visa's codefendants have already settled. Order Granting Motion for Final Approval of Settlements, ECF No. 261, *Mackmin v. Visa Inc.*, No. 11-cv-01831 (D.D.C. Aug. 8, 2022). If they were to lose on the merits, Defendants would face treble damages under the Clayton Act, an amount that they assert would exceed their annual net income. Such relatively large exposure "push[es] litigants inexorably toward settlement" and satisfies the death knell requirement. *Rail Freight I*, 725 F.3d at 252. The questionable accuracy of unclear language in the district court's opinion combines with the "death knell" settlement pressure to warrant our exercise of interlocutory appellate jurisdiction.

**B.**

Defendants' sole challenge to the class certification order is that the district court abused its discretion in holding that common questions predominate over individualized ones. A district court may certify a class only if it is convinced "after a rigorous analysis" that the proposed class can "satisfy through evidentiary proof" the requirements of Rule 23(a) and at least one provision of Rule 23(b). *Comcast*, 569 U.S. at 33-34; *see Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160-61 (1982). The district court certified these classes under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). That requirement is satisfied when questions calling for individualized determination are outweighed by questions that are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869* (*Rail Freight II*), 934 F.3d 619, 622 (D.C. Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

The district court's legal analysis is brief but materially correct. The court's certification order does not rest on an incorrect legal standard. And we discern no substantive inadequacy or other legal error in the district court's evidentiary assessment. We accordingly affirm.

**1.**

Mastercard and Visa object that the district court failed to "take a hard look at whether plaintiffs' injury models can prove classwide injury through common proof," as binding precedent requires; they assert that the court instead pretermitted the requisite legal scrutiny by "improperly deferring it to the 'merits' stage." Appellants' Br. 14; *see id*. at 19. The district court must state and apply the correct legal standard, and failure to do so would itself constitute an abuse of discretion requiring reversal and remand. *See Kickapoo Tribe of Indians of Kickapoo Reservation in Kan. v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995). We conclude that Defendants' assertions

5

that the district court applied an incorrect legal standard are unfounded.

To support certification based on predominance, plaintiffs' evidence must show their claims are susceptible to common proof. The rigorous analysis a district court is required to conduct in support of its certification order sometimes involves probing the merits of plaintiffs' claims, which the Supreme Court has made clear is permissible insofar as necessary to ensure that the Rule 23 requirements are met. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). That said, plaintiffs need only genuinely contest, not definitively rule out, defendants' alternative ways that a reasonable factfinder might view the evidence. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). In *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, for example, the Supreme Court held that plaintiffs in a securities fraud class action seeking to show predominance need not prove at the class-certification stage that an alleged misrepresentation did in fact materially affect all class members' stock price, even though plaintiffs "certainly must prove materiality to prevail on the merits." 568 U.S. at 459. As the Court explained, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.*

The district court applied the correct legal standard here when it concluded that Plaintiffs had carried that burden, explaining that "[u]pon careful review of the parties' submissions, including their expert reports," it found that "there is sufficient common evidence of resulting injuries and the amount of those injuries" to satisfy Rule 23(b)(3). *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *5. The court expressly acknowledged its obligation to "give careful scrutiny to the relation between common and individual questions" and correctly recognized that "a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized class-wide proof." *Id.* (quoting *Tyson Foods*, 577 U.S. at 453) (internal quotation marks omitted). The court aptly distinguished Plaintiffs' burden of establishing predominance at the class certification stage from their burden of prevailing on liability and damages at trial: The court recognized that common evidence sufficient for class certification need not conclusively establish class-wide liability and damages, but that Plaintiffs must present creditable evidence from which questions common to the class members' claims could be resolved at trial in one stroke. *Id.* at *5-6 (citing *Amgen*, 568 U.S. at 459, and *Rail Freight II*, 934 F.3d at 622-23).

The Supreme Court has rejected the idea that "*any* method of measur[ing injury] is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 36; *accord Rail Freight I*, 725 F.3d at 253-54. Since *Comcast*, this court has explained that "[c]ommon questions of fact cannot predominate where there exists no *reliable* means of proving classwide injury in fact." *Rail Freight I*, 725 F.3d at 252-53 (emphasis added). In keeping with these precedents, the district court here approved Plaintiffs' evidentiary case as "reasonable" and based on "well established," "well-accepted methodolog[ies]" showing class-wide injury. *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6.

Read in context, the district court's comment that "plaintiffs, at this stage in the proceedings, need only demonstrate a colorable method by which they intend to prove class-wide impact," *id.* (citing *In re Vitamins*, 209 F.R.D. at 264), does not undercut the soundness of the court's reasoning. Defendants highlight the term "colorable" as contrary to more recent rulings demanding that

6

district courts take a "hard look" at models purporting to show class-wide injury. They read the district court's use of the word "colorable" as adopting a "lenient standard" that runs counter to Rule 23 and binding precedent. *See* Reply Br. 22. But in context, the district court appears to have used "colorable" to denote not merely non-frivolousness, but evidence "appearing to be true, valid, or right." *See Colorable*, BLACK'S LAW DICTIONARY (11th ed. 2019). We do not read the district court to indulge the kind of "arbitrary" or frivolous method of showing class injury that *Comcast* warns against. 569 U.S. at 35; *see id.* at 35-36. As described below, the court's review of the evidence comports with Supreme Court holdings that require district courts to closely review the record at the class certification stage—and thereby to ensure that plaintiffs provide a reliable method for establishing class-wide injury, *Rail Freight I*, 725 F.3d at 252-53, that is tied to plaintiffs' theory of liability, *Comcast*, 569 U.S. at 35-36, and complies with our precedent requiring that statistical models offered by plaintiffs "show all class members suffered *some* injury," *Rail Freight I*, 725 F.3d at 252; *see also Rail Freight II*, 934 F.3d at 623-25. In its analysis, the district court confirmed that each group of plaintiffs cleared those hurdles. That does not constitute reversible error.

**2.**

The district court did not cite *Comcast*, but it did adhere to its demands. The court's certification decision explains the basis on which it concluded that plaintiffs here "satisfy through evidentiary proof" that common issues predominate. *Comcast*, 569 U.S. at 33-34. And the record supports the district court's finding that "all three plaintiff groups have demonstrated that common evidence will predominate in proving each element of their claims." *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *5. The court confirmed not only that Plaintiffs offered common proof of injury, but also that their methods of establishing injury were reasonable, well accepted, and reliable. We consider the district court's approval of the showings of the *Burke*, *Mackmin*, and ATM Operator Plaintiffs in turn.

**a.**

The district court acted within its informed discretion in concluding that the *Burke* Plaintiffs put forth a "reasonable," "well established" methodology that "provides for class-wide resolution" of injury and damages. *Id.* at *6. Its analysis of the evidence comports with *Comcast*. The district court based its predominance determination on the *Burke* expert's opinion, drawn from "significant academic literature," that a supra-competitive network fee economically affects the price of the service as would an industry-wide "tax." *Id*. According to the *Burke* Plaintiffs' theory, that "tax" is "fully incorporated into industry-wide prices," meaning that independent ATM operators pass on a portion of that overcharge to direct consumers—the cardholders who use independent ATMs. *Id*. The district court also appropriately concluded that the *Burke* expert's "overcharge damages model," which tracks *Burke* Plaintiffs' industry-wide tax theory, "us[es] well-accepted methodology" to provide evidence of class-wide injury. *Id.*

In antitrust litigation, when a direct consumer argues that an intermediary business has passed on an anticompetitive overcharge, "the typical way in which passed-on damages are computed" is "by either the 'yardstick' method or the 'before-and-after' method." PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 346k1 (5th ed. 2022) (footnotes omitted).

7

Yardstick analysis computes antitrust damages by comparing the prices paid by plaintiffs with those paid by a consumer in a comparable market unaffected by the antitrust violation. *Id.* This generally accepted method of calculating passed-on overcharges quantifies consumer harm without reference to the precise amount of overcharge an intermediary passes on to a direct purchaser. *See id.*

The *Burke* Plaintiffs' expert, Dr. William Lehr, selected Puerto Rico as a yardstick. The *Burke* Plaintiffs explained that he was unable to find other real-world examples because the ATM Access Fee Rules have been in place in the United States for nearly as long as state and federal governments have permitted ATM operators to charge access fees. The expert report identified Puerto Rico as providing a useful real-world approximation of an otherwise comparable market free from Mastercard's and Visa's alleged anticompetitive conduct, because in Puerto Rico differential surcharging is permitted as between domestic and cross-border transactions. After conducting an empirical analysis of the Puerto Rican ATM market, the expert concluded that in the but-for world that Puerto Rico approximates, ATM operators charge lower access fees to cardholders who initiate transactions that cost the ATM operator less to process. But because the ATM Access Fee Rules forbid that practice in the United States, the expert reasoned, cardholders in the *Burke* class pay more to withdraw money from independent ATMs than they otherwise would. The expert also developed an overcharge damages model based on an industry-wide tax theory. That model posited a one-to-one inverse relationship between cardholder access fees and net interchange, which the expert's analysis of the Puerto Rican ATM market corroborated.

Courts have deemed the kind of yardstick analysis performed by the *Burke* expert appropriate in antitrust cases in which it is not possible to isolate the effect of assertedly anticompetitive conduct by performing a before-and-after comparison. *See, e.g.*, *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 850-52 (5th Cir. 2015) (affirming district court's decision to admit as "reliable" expert testimony that used yardstick analysis to assess antitrust damages when newly formed plaintiff "had no financial performance [data] to use as the 'before' in the before and after test"); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114, 124-25 (1969) (holding it was reasonable for the district court to infer a causal relationship between anticompetitive conduct and antitrust injury based on comparison of its performance in the Canadian television market subject to anticompetitive practice with the U.S. market absent the challenged practice). We have no basis to dispute the district court's finding that this long-accepted approach to establishing and quantifying injury in consumer overcharge cases was reliable. *See Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792-93 (6th Cir. 2002) (holding district court did not abuse discretion by finding "sufficiently reliable" expert testimony that used, *inter alia*, "generally accepted" "yardstick" method of proving antitrust damages).

Defendants assail the *Burke* Plaintiffs' evidence of predominance by arguing that the Defendants' expert's regression—developed as an alternative to the *Mackmin* Plaintiffs' regression—identifies some independent ATM operators that did not raise access fees when their net interchange fell. In other words, Defendants' regression, which analyzed bank transactions between 2010 and 2015, did not show all independent ATM Operators increasing cardholder access fees in lockstep with rising network fees.

Defendants' focus on evidence of pass-through misunderstands the *Burke* Plaintiffs'

8

theory. As the district court recognized, the *Burke* Plaintiffs' theory of injury is that *all* class members are deprived of the competitive opportunities and lower prices available to "consumers in the but-for world," in which anticompetitive obstacles are absent. *See Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *4. In line with that theory, the *Burke* Plaintiffs' evidentiary submissions compare prices paid in the "real world" with the lower prices that would be paid in a world free from the Access Fee Rules. This type of yardstick analysis does not depend on proof that an ATM operator passes on the cost of the network fee to the ATM user in every transaction. *See* AREEDA & HOVENKAMP ¶ 346c (explaining that yardstick analysis "do[es] not require computing the overcharge passed on at each stage").

Defendants' real-world regression does not engage at all with Plaintiffs' evidence that the *Burke* class members paid more than they would have in a world with no ATM Access Fee Rules. The *Burke* Plaintiffs' evidence, which a reasonable factfinder could credit, shows that all class members were injured. The Defendants' expert analysis of real-world data, chosen without accounting for how that data may be tainted by Defendants' alleged anticompetitive conduct, may raise some material issue for trial, but it cannot defeat predominance.

**b.**

The district court acted well within its discretion in also holding that the *Mackmin* Plaintiffs had adduced class-wide evidence of antitrust injury. The *Mackmin* class did so through statistical modeling, together with "defendants' own documents support[ing] the relationship between net interchange and surcharges," "economic theory and empirical studies," and "market structure analysis." *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6. That evidence showed that "all or virtually all class members . . . pay higher [access fees]" than they would without the Access Fee Rules. *Id.*

*Mackmin* Plaintiffs' expert, Dr. Dennis W. Carlton, drew on academic literature to support his conclusion that supra-competitive network fees made possible by the ATM Access Fee Rules lead to increased cardholder access fees. Referencing peer-reviewed studies, Dr. Carlton observed that "[c]omplete pass-through of an industry increase in costs [to consumers] is often expected and found empirically." J.A. 3098 n.96 (Carlton Expert Report). He also noted that complete pass-through "is not necessary for my analysis," since "[t]he key is that an increase in industry costs is associated with an increase in retail prices, not whether that increase is precisely of the same amount as the cost increase." J.A. 3098 n.96 (Carlton Expert Report). In further support of *Mackmin* Plaintiffs' theory of injury, Dr. Carlton ran a regression analyzing changes in average net interchange and cardholder access fees at Wells Fargo ATMs between 2010 and 2017 and found a statistically significant relationship between net interchange and access fees. J.A. 3110 (Carlton Expert Report). Finally, Dr. Carlton highlighted Defendants' statements corroborating that relationship, such as Mastercard's statement in a 2017 presentation that "[a]s interchange decreases ATM operators increase their [access] fees." J.A. 3105 (Carlton Expert Report) (quoting J.A. 1930 (Berman Decl., Ex. 1, Mastercard Presentation 6)). Those common sources of proof all evidence harm across the entire *Mackmin* class.

Defendants' expert responded to the *Mackmin* Plaintiffs' evidence with his *own* regression analysis of data for the top 100 banks by volume of transactions but limited his analysis to one of

9

Visa's ATM networks over a five-year period from 2010 to 2015. *See* J.A. 6675-76, 6764 (Hubbard Expert Report). Based on his alternative regression, Defendants' expert concluded that for 15 of the 100 banks the data did not show an inverse and statistically significant relationship whereby lower average net interchange correlated with higher average cardholder access fees. *See* J.A. 6677 (Hubbard Expert Report); Appellants' Br. 34-35. This separate expert analysis does not mean that the *Mackmin* Plaintiffs' model is itself either necessarily flawed or incapable of establishing class-wide injury.

The district court at the class certification stage did not focus on which of the conflicting models to credit. Rather, the court correctly considered whether the *Mackmin* Plaintiffs offered reliable, generalized proof of injury that a reasonable factfinder could credit and that, if credited, would enable resolution of class claims without piecemeal proof. *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6; *see Tyson Foods*, 577 U.S. at 454-55 (affirming that "[a] representative or statistical sample, like all evidence, is a means to establish or defend against liability" in class and individual cases alike).

In sum, the district court saw that Defendants "attack primarily whether plaintiffs' methods *will in fact* prove injury and damages for each class-member," not whether the elements of Plaintiffs' claims are generally susceptible to class-wide proof with the evidence Plaintiffs have presented. *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6 (emphasis added). A defendant does not defeat predominance simply by offering a contrary statistical model that the ultimate factfinder might or might not embrace.

### c.

The district court also acted within its sound discretion in holding that the third plaintiff class, the ATM Operators, had shown predominance. The court explained that the ATM Operators presented a logical method to arrive at a "reliable estimate" of class-wide harm, showing "that individualized inquiries would not be necessary to ascertain the fees paid by each class member." *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6. This cuts to the heart of the predominance requirement: avoiding individualized mini-trials. *Rail Freight II*, 934 F.3d at 625. Common questions cannot "predominate over any questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), if the district court must undertake individualized inquiries to sort injured from uninjured class members, *see Rail Freight I*, 725 F.3d at 252. The district court reasonably concluded that the ATM Operators presented common evidence of injury to all class members, and thus need not identify any mechanism to weed out from the class uninjured members that Defendants contend their evidence would prove if it were credited over the ATM Operators' evidence.

Defendants argue that some members of the ATM Operator class did not pay fees for use of Mastercard's and Visa's networks, whether directly or indirectly, and are therefore uninjured. According to Defendants, three types of ATM Operator class members might not have paid network fees: (1) ATM Operators that do not appear by name in Mastercard's and Visa's billing records, Appellants' Br. 42-43; (2) entities that do not "receive or pay any components of net interchange," because a third party, such as an independent sales agent, is entitled to receive the interchange revenue from which network fees are subtracted, *id.* at 44; and (3) entities "involved

in operating and servicing independent ATMs," such as a firm that "manages the initial [ATM] setup and holds encryption keys," or "a retail store [that] may own an ATM on its premises" but "contract[s] with an independent sales organization to connect its ATM to banks and payment networks," *id.* at 43-44.

None of Defendants' arguments defeats predominance. First, Mastercard and Visa do not maintain billing accounts that separately list all ATM Operators, because independent ATM operators generally access Mastercard and Visa networks through sponsoring institutions that pay network fees on their behalf. Thus, one would not expect to find ATM Operator class members identified by name in Defendants' billing records. Mastercard does not maintain a dataset that links ATM Operators to the sponsoring banks that pay network fees on ATM Operators' behalf. Moreover, Visa admits that some of the billing records it disclosed in discovery are "not entirely comprehensive (and become[] less so further back in time)." J.A. 664 (Zona Expert Report).

Second, ATM Operator class members who assign a portion of their payment obligations and revenues to other entities are no less injured by illegal practices that diminish the revenue. If, for example, an ATM Operator assigns some (or all) of its net interchange revenue to a premises owner, it is effectively making a rental payment. Whether an ATM Operator takes the intermediate step of depositing any net interchange revenue into an account before drawing on it to pay bills is not determinative of whether the ATM Operator suffers harm.

Third, entities that manage ATM setup, service providers that handle ATM encryption keys, and retail stores that own on-site ATMs but do not originate transactions are excluded from the Class Definition. The definition provides that "[p]ersons or entities that make space available to ISOs or affiliates of ISOs to operate a Qualified ATM on property they own or control" (the retail store) and "Encryption and Support Organizations that manage encryption keys or service Qualified ATMs" (an entity that holds the encryption keys) "are not ATM Operators." *See* J.A. 521 (Operators' Mot. for Class Cert.) (defining Class Definition terms); J.A. 588 (Am. Order Granting Class Cert.) (defining class subject to limitations and definitions set forth in Operators' class certification motion). Any failure to show harm to them cannot detract from the predominance of questions common to the members of the class as actually defined.

The district court acted within its discretion in determining that the record includes common evidence of injury to all members of the ATM Operator class. Defendants' contention that predominance is defeated by the lack of a mechanism for weeding out uninjured class members depends on a factfinder crediting their submission that such members exist. On this record, however, nothing requires a conclusion that the ATM Operator class includes uninjured members. The district court's predominance determination is thus unaffected by lack of a common method to identify uninjured members. The district court's holding that plaintiffs' evidence showed the requisite predominance was thus legally correct and supported by the record.

### 3.

Finally, the district court's order does not bear the hallmarks of class certification decisions that we or the Supreme Court have invalidated for lack of rigor. Contrary to Defendants' assertions, the district court did not rely in support of class certification on a statistical model that

is inconsistent with plaintiffs' theory of injury, as in *Comcast*. *See* 569 U.S. at 35. It did not rely on a statistical model offered by plaintiffs that detects injury where all agree none exists, as in *Rail Freight I*. *See* 725 F.3d at 253-54. Nor did the court accept as common evidence of injury a statistical model that, on its own terms, identifies a high percentage of uninjured class members, as in *Rail Freight II*. *See* 934 F.3d at 623-24. Defendants fail to fit this case within the precedents on which their opposition to class certification rests.

Mastercard's and Visa's attempts to show error depend instead on extension of our precedents in unsupported and unworkable ways. Defendants challenge the *Mackmin* and *Burke* Plaintiffs' evidence by offering their own expert's reconfiguration of the *Mackmin* statistical model. That challenge does not point to internal flaws in either the *Mackmin* Plaintiffs' statistical model or the *Burke* Plaintiffs' distinct industry-wide tax model. Defendants have simply offered their own, contrasting model and argued that because *their model* treats some members in the *Mackmin* and *Burke* classes as uninjured, predominance is just as lacking here as, for example, in *Rail Freight I* or *II*. But the differences just noted between this case and the precedents are decisive.

Defendants assert that the Wells Fargo dataset that the *Mackmin* Plaintiffs' expert analyzes is unrepresentative, and that Defendants' expert analysis of a different dataset relating to 100 banks is more trustworthy. But, by its own terms, Plaintiffs' evidence shows that all class members were injured. And Plaintiffs, like Defendants, have a theory that a factfinder could credit as to why their data selection is superior. Defendants' contention that their model showing unharmed members is more accurate and credible than Plaintiffs' different models showing that all members were harmed is thus precisely the kind of material factual dispute that "is better suited for adjudication of plaintiffs' injury and damages on the merits." *Nat'l ATM Council, Inc.*, 2021 WL 4099451, at *6; *see also Tyson Foods*, 577 U.S. at 457 (explaining that a defense that common proof is unrepresentative "is itself common to the claims made by all class members" and so does not defeat predominance).

The district court was not required at class certification to make the ultimate determination which of two dueling experts to accept, and no party here argues that it would be either necessary or appropriate to do so at this stage on this record. *See* Oral Argument Tr. 42:1-4; 58:14-16. We find no error in the district court's conclusion that the *Burke*, *Mackmin*, and ATM Operator Plaintiffs satisfied Rule 23(b)(3) by providing reasonable, wholesale methodologies, tethered to Plaintiffs' respective theories of liability, showing that all class members suffered injury.

\* \* \*

For those reasons, we affirm the district court's class certification decision.