Nos. 21-7109, 21-7110, 21-7111

In The

# United States Court of Appeals

For The District of Columbia Circuit

⟫⟫◄◄

NATIONAL ATM COUNCIL, INC.; ATMS OF THE SOUTH, INC.; BUSINESS
RESOURCE GROUP, INC.; WASH WATER SOLUTIONS, INC.; ATM
BANKCARD SERVICES, INC.; SELMAN TELECOMMUNICATIONS
INVESTMENT GROUP, LLC; TURNKEY ATM SOLUTIONS, LLC; TRINITY
HOLDINGS LTD, INC.; JUST ATMS USA, INC.; 901 FINANCIAL SERVICES
LLC,

and

ANDREW MACKMIN; BARBARA INGLIS; SAM OSBORN,

and

PETER BURKE; KENT HARRISON; MARIN P. HEISKELL;

BRYAN BYRNES,

*Plaintiffs-Appellees*,

v.

VISA INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE
ASSOCIATION; PLUS SYSTEM, INC.; MASTERCARD INC.; AND

MASTERCARD INTERNATIONAL INC.,

*Defendants-Appellants*.
————————————

*On Appeals by Permission under Fed. R. Civ. P. 23(f) from an Order of the United
States District Court for the District of Columbia
Case No. 11-cv-1831, Hon. Richard J. Leon, District Judge*

## PLAINTIFFS-APPELLEES' OPPOSITION TO PETITION FOR REHEARING *EN BANC*

(Counsel Listed on Inside Cover)

September 12, 2023

Douglas G. Thompson Jr
FINKELSTEIN THOMPSON LLP
2201 Wisconsin Ave, N.W.
Washington, DC 20001
Telephone: 202-337-8000
dthompson@finkelsteinthompson.com

Christopher Lovell
LOVELL STEWART HALEBIAN
JACOBSON LLP
500 Fifth Ave, Suite 2440
New York, NY 10110
Telephone: (212) 608 1900
CLovell@lshllp.com

*Counsel for Appellees Peter Burke, Kent
Harrison, Marin P. Heiskell, and Bryan
Byrnes, and the Independent ATM
Consumer Class*

Jonathan L. Rubin
MOGINRUBIN LLP
2101 L Street, N.W., Suite 300
Washington, D.C. 20037
Telephone: (202) 630-0616
jrubin@moginrubin.com

Daniel J. Mogin
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 687-6611
dmogin@moginrubin.com

*Class Counsel for the ATM Operator
Class Plaintiffs-Appellees*

David M. Cooper
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
davidcooper@quinnemanuel.com

Adam B. Wolfson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
adamwolfson@quinnemanuel.com

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Ben M. Harrington
Benjamin J. Siegel
HAGENS BERMAN SOBOL
SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3034
benh@hbsslaw.com
bens@hbsslaw.com

*Co-Lead Counsel for the Mackmin
Consumer Class Plaintiffs-Appellees*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

**I.    Parties**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Supplement to Defendants' Petition.

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellee, ATM Bankcard Services, Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, ATMs of the South, Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Business Resource Group, Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Just ATMs U.S.A., Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Selman Telecommunications Investment Group, LLC, states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, T & T Communications, Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Trinity Holdings Ltd., Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Turnkey ATM Solutions, LLC, states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, Wash Water Solutions, Inc., states it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellee, 901 Financial Services LLC, states it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

## II.     Ruling Under Review

References to the rulings under review appear in the Supplement to Defendants' Petition.

## III.    Related Cases

References to the related cases appear in the Supplement to Defendants' Petition.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY.........................................................................................vi

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................3

I.     THE PANEL AND THE DISTRICT COURT APPLIED THE
CORRECT LEGAL STANDARD..................................................3

II.    DEFENDANTS' CHALLENGES TO THE EVIDENCE IN
SUPPORT OF CERTIFICATION OF EACH CLASS ARE
MERITLESS...............................................................................6

       A.    *Burke* Class................................................................7

       B.    *Mackmin* Class ........................................................10

       C.    ATM Operator Class ..................................................14

CONCLUSION...................................................................................17

CERTIFICATE OF COMPLIANCE .....................................................19

## TABLE OF AUTHORITIES

**Page**

CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013).......................................................................5

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).......................................................................1, 9

*In re Elec. Books Antitrust Litig.*,
    2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014)....................................8

*In re Loestrin 24 Fe Antitrust Litig.*,
    2019 WL 3214257 (D.R.I. July 2, 2019)..........................................8

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015).....................................................10

*In re Polyester Staple Antitrust Litig.*,
    2007 WL 2111380 (W.D.N.C. July 19, 2007) ...................................8

*In re Polyurethane Foam Antitrust Litig.*,
    314 F.R.D. 226 (N.D. Ohio 2014) ..................................................8

*In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013)................................................1, 6, 8

*In Re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*,
    934 F.3d 619 (D.C. Cir. 2019)................................................1, 4, 8

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    292 F. Supp. 3d 14 (D.D.C. 2017)..................................................9

*In re TFT-LCD Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010)....................................................8

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)...............................................................11, 12

# GLOSSARY

| | |
|---|---|
| Burke Br. | Brief of Appellees Burke Class Plaintiffs in Case No. 21-7111 |
| Mackmin Br. | Brief for Plaintiffs-Appellees *Mackmin* Class in Case No. 21-7110 |
| JA | Joint Appendix |
| Op. | Judgment and Memorandum Opinion, *National ATM Council, Inc., et al. v. Visa Inc., et al.*, No. 21-7109 (consolidated with 21-7110, 21-7111) (D.C. Cir. July 25, 2023) |
| Pet. | Petition for Rehearing *En Banc* by Appellants |

## INTRODUCTION

Defendants' petition for *en banc* review reiterates the same arguments the panel correctly rejected. The panel held the district court neither misstated the standards ("[t]he court's certification order does not rest on an incorrect legal standard," Op. 5) nor misapplied them (there is no discernable "substantive inadequacy or other legal error in the district court's evidentiary assessment," *id.*). Because *en banc* consideration is not necessary to secure or maintain uniformity of the Court's decisions, Defendants' petition should be denied.

The panel held that the district court's decision was consistent with the same three cases relied on by Defendants.[1] The panel noted that "the district court did not rely in support of class certification on a statistical model that is inconsistent with plaintiffs' theory of injury, as in *Comcast*." Op. 11-12. "It did not rely on a statistical model offered by plaintiffs that detects injury where all agree none exists, as in *Rail Freight I*." Op. 12. "Nor did the court accept as common evidence of injury a statistical model that, on its own terms, identifies a high percentage of uninjured class members, as in *Rail Freight II*." *Id.* The panel's conclusion applies equally well to Defendants' petition: "Defendants fail[ed] to fit this case within the

---

[1] Defendants sought *en banc* solely under Fed. R. App. P. 35(b)(1)(A), based on a supposed conflict with *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), *In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869 (Rail Freight I)*, 725 F.3d 244 (D.C. Cir. 2013), and *In Re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869 (Rail Freight II)*, 934 F.3d 619 (D.C. Cir. 2019). Pet. 1.

precedents on which their opposition to class certification rests. … [and] depend[s] instead on extension of our precedents in unsupported and unworkable ways." *Id.*

The panel applied settled law in affirming class certification because the district court "confirmed not only that Plaintiffs offered common proof of injury, but also that their methods of establishing injury were reasonable, well accepted, and reliable." Op. 7.  Defendants do not argue that this legal standard is incorrect. Instead, they create a misleading rendition of the panel's decision that bears little resemblance to what the panel actually says.  The panel does not uphold "the certification of three classes containing a significant number of uninjured class members" nor endorse "arbitrary" methods of proving class-wide injury.  Pet. 12. The panel specifically held that the district court did not accept an "'arbitrary' or frivolous method of showing class injury," and that its "review of the evidence comports with Supreme Court holdings that require district courts to closely review the record" and "complies with our precedent requiring that statistical models offered by plaintiffs 'show all class members suffered *some* injury.'" Op. 7.

Because Defendants do not contest the legal standard the panel *actually applied* (as opposed to their mischaracterization), the panel's non-published decision does *not* have the "far-reaching implications" Defendants claim.  Pet. 2.  The panel itself observed, "[t]he certification decision does not pose an important and unsettled, class action-related legal question."  Op. 4.  The panel's meticulous

application of well-settled case law to the particular facts of these cases—applying the abuse-of-discretion standard of review that Defendants simply ignore—does not warrant *en banc* review.

## ARGUMENT

## I.   THE PANEL AND THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD

Defendants never address the legal standard the panel actually applied.  Pet. 8-10.  The panel stated:

> [T]he court's review of the evidence comports with Supreme Court holdings that require district courts to closely review the record at the class certification stage—and thereby to ensure that plaintiffs provide a reliable method for establishing class-wide injury, *Rail Freight I*, 725 F.3d at 252-53, that is tied to plaintiffs' theory of liability, *Comcast*, 569 U.S. at 35-36, and complies with our precedent requiring that statistical models offered by plaintiffs 'show all class members suffered *some* injury,' *Rail Freight I*, 725 F.3d at 252; *see also Rail Freight II*, 934 F.3d at 623-25.  In its analysis, the district court confirmed that each group of plaintiffs cleared those hurdles.

Op. 7.

Defendants repeatedly mischaracterize the panel's opinion.  *First*, the panel did not "plac[e] the burden on defendants to identify uninjured class members" or "reliev[e] plaintiffs of their burden of establishing classwide injury."  Pet. 2.  The panel actually placed the burden on Plaintiffs: "The district court applied the correct legal standard here when it concluded that *Plaintiffs had carried [their] burden*."  Op. 6 (emphasis added).

3

*Second*, the panel did not state "that this Court's precedent forecloses class certification *only* where plaintiffs *actually concede* that their model, 'on its own terms, identifies a high percentage of uninjured class members.'" Pet. 10 (quoting Op. 12 (emphasis added)). The panel noted that *Rail Freight II* involved a plaintiff concession, but it did not say that *only* a concession would suffice to defeat class certification. Op. 12. In *Rail Freight II*, plaintiffs' *own* model showed "2,037 members of the proposed class—or 12.7 percent—suffered 'only negative overcharges' and thus *no* injury from any conspiracy." *Rail Freight II*, 934 F.3d at 623-24. Defendants claim there is a conflict with *Rail Freight II*, but do not address this obvious distinction the panel identified. Op. 12.

*Third*, the panel did not say that "'*any* method' offered by plaintiffs, 'no matter how arbitrary,' is sufficient at the class certification stage as long as plaintiffs refuse to concede that their methodology sweeps in uninjured class members." Pet. 12. The panel actually said exactly the opposite: "The Supreme Court has rejected the idea that '*any* method of measur[ing injury] is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.'" Op. 6 (quoting *Comcast*, 569 U.S. at 36); *see* Op. 7 ("We do not read the district court to indulge the kind of 'arbitrary' or frivolous method of showing class injury that *Comcast* warns against.").

*Fourth*, the panel did not approve models of injury that were merely

4

"colorable." Pet. 10. The panel actually said that Plaintiffs' methods and evidence were *more than colorable*, holding that the "[district] court confirmed not only that Plaintiffs offered common proof of injury, but also that their methods of establishing injury were reasonable, well accepted, and reliable." Op. 7, *see* Op. 7-12 (applying standard to each set of plaintiffs and their experts). Defendants contend the district court examined the models only "in the abstract," Pet. 2, but there was nothing abstract about either the district court's or the panel's fact-specific analysis of the evidence.

While Defendants contend the district court should have delved deeper into the merits, Pet. 9, the panel and the district court correctly followed *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013), which "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459; *see also* Op. 6; JA583, JA585. The panel ruled that the district "court aptly distinguished Plaintiffs' burden of establishing predominance at the class certification stage from their burden of prevailing on liability and damages at trial …." Op. 6. Defendants themselves understand that models of injury need only be "capable" or "susceptible" of class-wide proof, Pet. 11, precisely the standard the panel and district court applied, Op. 5-6; JA582.

Defendants rely heavily on the appearance of the single word "colorable" in

the district court's decision.  But the panel did not endorse a mere "colorable" method of proving class-wide injury as the standard and concluded that the district court did not either.  Op. 7 (the district court's review "ensure[d] that plaintiffs provide a reliable method for establishing class-wise injury … tied to plaintiffs' theory of liability").  The panel declined Defendants' invitation to focus myopically on the word "colorable" and to ignore the findings that the evidence was "reasonable and well established."  JA583.  Given the panel's express acknowledgement that the evidence must be "reliable" (*see* Op. 7), there can be no conflict with *Rail Freight I* (*see* Pet. 1, 10-11), which applied exactly the same test.  Op. 14; *see also Rail Freight I*, 725 F.3d at 252-53 (class plaintiffs must present a "reliable means of proving classwide injury").

In short, the panel and the district court both applied the correct and well-established reliability standard that Defendants do not contest.  Defendants' petition amounts to nothing more than a disagreement with the panel's analysis of the district court's decision, which does not warrant *en banc* review.

## II.  DEFENDANTS' CHALLENGES TO THE EVIDENCE IN SUPPORT OF CERTIFICATION OF EACH CLASS ARE MERITLESS

The panel dispelled Defendants' argument that because the district court opinion was "notably terse," it did not employ "rigorous analysis."  Pet. 9.  The panel reviewed the record and ruled that the district court "explains the basis on which it concluded that plaintiffs here satisfy through evidentiary proof that common issues

6

predominate," and "the record supports the district court's finding" as to "all three plaintiff groups." Op. 7 (cleaned up). The panel elaborated that the district court embarked "'[u]pon careful review of the parties' submissions, including their expert reports,'" and "expressly acknowledged its obligation to 'give careful scrutiny to the relation between common and individual questions.'" Op. 6. Defendants essentially contend that the panel should have disbelieved the district court's assurance of a careful review while ignoring the class-specific discussion demonstrating that careful review, but they fail to show that the district court did not rigorously assess the evidence, let alone abuse its discretion.

### A.    *Burke* Class

Common, class-wide evidence shows that the access fee price-fixing restraints impact *ALL* ATM transactions, protect Defendants' high-price network fees from price competition, and injure all independent ATM users. The *Burke* Plaintiffs' expert relies on empirically-proven economic theory and literature to show that higher ATM network fees act as an industry-wide tax, increase marginal processing costs to *ALL* ATMs and cause higher ATM surcharges to cardholders. Op. 7. None of this evidence varies among individual class members. The panel correctly held the certification of the *Burke* class was based on reliable evidence capable of showing class-wide injury.

7

Defendants make the same argument—now rejected twice, once by the district court and again by the panel—that their own alternative regression evidence "did not show all independent ATM Operators increasing cardholder access fees in lockstep with rising network fees."  Op. 8-9; *see* Pet. 12-14.  But the argument that there is no injury if some prices did not increase historically misses the point that all surcharges would have been lower in the but-for world:

> Defendants' real-world regression does not engage at all with Plaintiffs' evidence that the *Burke* class members paid more than they would have in a world with no ATM Access Fee Rules.

Op. 9.  Federal courts have consistently agreed that evidence some prices did not increase is unpersuasive when common evidence shows that "but for world" prices would have been lower.[2]

The *Burke* certification does not conflict with *Rail Freight*, which involved a heterogeneity of shippers and individually negotiated prices.  *Rail Freight II*, 934 F.3d at 625.  The *Rail Freight* plaintiffs' regression model exhibited false positives and "detects injury where none *could* exist."  *Rail Freight I*, 725 F.3d at 252 (emphasis added).

---

[2] *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.,* 2019 WL 3214257, at *13-14 (D.R.I. July 2, 2019); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *19 (S.D.N.Y. Mar. 28, 2014); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 283-84 (N.D. Ohio 2014); *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 583, 605 (N.D. Cal. 2010); *In re Polyester Staple Antitrust Litig.*, 2007 WL 2111380, at *26 (W.D.N.C. July 19, 2007).

*Burke* does not depend on a "before-after" regression to prove injury from a covert conspiracy. The ATM price fixing rules are overt and industry-wide in scope. *Burke* class members pay non-negotiable prices for a commodity-like service whose marginal cost is inflated across the entire industry. Because of the long duration of the restraint, the data for a "before-after" regression is nonexistent. But as the panel correctly observed, "yardstick" analysis of a comparable ATM market corroborates the reliability of the *Burke* model. Op. 7-8.

Defendants offer their own alternative regressions, but the unavailability of true "before-after" data does not excuse bad science. Defendants' regressions are unreliable because they do not compare real-world prices with clean, competitive but-for-world prices;[3] use only prices tainted by the anticompetitive environment; and fail to control for other factors that affect ATM surcharges.[4] Defendants' expert concedes that his regressions are not affirmative evidence that proves any class members were uninjured. JA7433-34, 7474.

---

[3] "In antitrust overcharge cases, . . . 'the usual measure of damage is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation.' This hypothetical construct is a world that is 'free of the restraints and conduct alleged to be anticompetitive.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 101 (D.D.C. 2017) (citations omitted).

[4] *See* Burke Br. 14. Failure to control for other factors renders the regressions unsound under *Comcast*. 569 U.S. at 36-38.

As this Court observed on a prior appeal, allegations founded on economic principles are provable at trial. *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015). Defendants' use of data tainted by their own misconduct to speculate that a few may not have paid surcharges that increased does not address the capability of the *Burke* model to prove that all paid surcharges **would have been lower in the "but for world."** As the panel put it, "The Defendants' expert analysis of real-world data, chosen without accounting for how that data may be tainted by Defendants' alleged anticompetitive conduct, may raise some material issue for trial, but it cannot defeat predominance." Op. 9.

Contrary to Defendants (Pet. 3), *Burke* presented "a reliable winnowing mechanism" for uninjured class members. Burke Br. 25-26; JA7578-83. The panel ruled that the issue does not defeat predominance because it "depends on a factfinder crediting [Defendants'] submission that such members exist." Op. 11.

## B. *Mackmin* Class

The panel properly concluded that "[t]he district court acted well within its discretion in also holding that the *Mackmin* Plaintiffs had adduced class-wide proof of antitrust injury." Op. 9. That proof came in several forms, including "statistical modeling, together with defendants' own documents supporting the relationship between net interchange and surcharges, economic theory and empirical studies, and market structure analysis." *Id.* (quotation and bracket marks omitted). The district

court determined that, together, this "evidence showed that all or virtually all class members pay higher access fees than they would without the Access Fee Rules." *Id.* (cleaned up). This fact-intensive determination, affirmed by the panel, does not warrant *en banc* review.

Ignoring most of the *Mackmin* Plaintiffs' classwide proof, Defendants' petition, like their appeal, focuses narrowly on a regression model developed by the *Mackmin* Plaintiffs' expert, Dr. Dennis Carlton. Pet. 14. Even as to the regression, Defendants' only contention is that Dr. Carlton used supposedly unrepresentative Wells Fargo data for modeling purposes. Defendants' expert reconfigured Dr. Carlton's model with a different dataset, and Defendants claim that his counter-regression reveals uninjured *Mackmin* Class members. *See* Pet. 14. Defendants mischaracterize the results of their counter-regression and ignore that it used flawed data that included *only* transactions over Visa networks, thereby skewing the results, as opposed to the Wells Fargo data that Plaintiffs' expert used, which properly included transactions over all networks. *See* Mackmin Br. 22-24.

In any event, their argument suffers a more fundamental defect: It is foreclosed by *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016). As the panel observed, *Tyson* holds that "a defense that common proof is unrepresentative 'is itself common to the claims made by all class members' and so does not defeat predominance." Op. 12 (quoting *Tyson*, 577 U.S. at 457). "Resolving that question"

11

whether the data is representative thus "is the near-exclusive province of the jury." *Tyson*, 577 U.S. at 459. This principle is dispositive as to the *Mackmin* Class. Defendants may challenge the representativeness of the Wells Fargo data at trial, but the representativeness of the dataset—Defendants' *only* challenge to the *Mackmin* Plaintiffs' class certification showing—is fundamentally a classwide issue. If Defendants are correct that the Wells Fargo data are unrepresentative, that impugns Dr. Carlton's regression as a whole, not as to particular *Mackmin* Class members. As the district court and panel correctly acknowledged, the task at class certification is not to resolve these types of classwide questions, but only to determine whether they predominate. Op. 10, 12; *see also Tyson*, 577 U.S. at 457.

A panel's straightforward application of Supreme Court guidance—here, *Tyson*—does not call for *en banc* review. This is true in the abstract, but particularly here because Defendants have made no attempt to refute the panel's reliance on *Tyson*'s teachings; their petition does not even cite to *Tyson*.

Defendants' remaining arguments as to the *Mackmin* Class are equally misguided. Defendants claim the panel mischaracterized their expert's model as "a contrary statistical model," rather than an application of Dr. Carlton's model to different data. *See* Pet. 14. This is just semantics. The panel understood that Defendants' expert had presented a "reconfiguration" of Dr. Carlton's model using a different dataset. *See* Op. 12. The panel rejected this challenge not because

12

Defendants had presented a "new model," *per se*, but because their analysis (however characterized) went to the representativeness of the Wells Fargo data and did "not point to internal flaws in … the *Mackmin* Plaintiffs' statistical model." Op. 12.

Straining to invoke *Rail Freight I*, Defendants also assert that Dr. Carlton's model "'detects injury where none could exist'" because 50,000 customers from one bank were supposedly uninjured. Pet. 14-15 (quoting *Rail Freight I*, 725 F.3d at 252). But Plaintiffs' model shows injury across the entire *Mackmin* Class. Op. 9. There can be uninjured class members only if the factfinder credits Defendants' counter-regression over Plaintiffs' regression and extensive other evidence, and the *Mackmin* Plaintiffs have offered many reasons (some unrebutted) for rejecting Defendants' approach. *See* Mackmin Br. 22-29. As the panel recognized, "Plaintiffs, like Defendants, have a theory that a factfinder could credit as to why their data selection is superior." Op. 12. There is no legal basis to resolve this classwide dispute under the guise of the predominance inquiry. Having determined that "the *Mackmin* Plaintiffs offered reliable, generalized proof of injury that a reasonable factfinder could credit," the district court properly declined to supplant the factfinder's role and determine which conflicting expert analysis should ultimately carry the day. Op. 10.

13

### C.     ATM Operator Class

Defendants advance the falsehood that the ATM Operator plaintiffs "have offered no evidence to demonstrate that all class members paid the full acquirer fee." Pet. 16.  To support their claim, Defendants first take issue with the unrebutted record evidence that an acquirer fee is levied by Defendants on all ATM transactions. Second, they ignore the plain language of the class definition, which includes only entities entitled to collect the interchange revenue from which the fee is deducted.

It is customary in the banking industry for institutions to publish fees charged on a per transaction basis.  ATM acquirer fees are no exception.  Visa's record of domestic ATM fees between 1995 and 2018, including the acquirer fee, are set forth at JA 2884-2889.  Mastercard's fees for the same period are summarized at JA 2891-2892.

To confirm that Visa consistently collected its published acquirer fees, Dr. Zona examined a wide range of data, including "all the available US billing for ATM acquirer fees associated with domestic surcharged cash withdrawals over Visa/Plus." JA627.  He reports calculations that "confirm that all domestic approved surcharged withdrawals were assessed an acquirer fee," *id.*, and that "[t]here are no independent ATM Operators who did not pay the full acquirer fee at some point after 2007." JA628.  Similarly, Dr. Zona reported that "Mastercard MCBS data shows … all

14

Class Members' transactions with Mastercard/Cirrus, were assessed acquirer fees at the anticompetitive level." JA626.

This evidence is unrebutted. Defendants offered no evidence of even a single domestic ATM transaction on which an acquirer fee was *not* collected by the network, nor evidence that any party other than the ATM operator that originated the transaction paid the acquirer fee, nor evidence of any dispute ever having arisen over the payment of an acquirer fee.

The panel soundly rejected Defendants' claim that *any* member of the ATM Operator class did not pay acquirer fees and thereby escaped injury. They recognized that independent ATM operators must access Mastercard and Visa networks through third parties that pay network fees on their behalf, so "one would not expect to find ATM Operator class members identified by name in Defendants' billing records." Op. 11. Although some class members *are* listed in Defendants' billing records—for example, ATM ISOs "registered" with the networks as service providers—Defendants' data attributes most class members' transactions to their sponsoring bank, commercial bank, or processor. JA640 (Zona Report, Technical Appendix: M2), JA659 (Technical Appendix: V2) (analyzing Defendants' billing data).

The panel also recognized that acquirer fees—which are deducted from the interchange revenue earned by the ATM operator originating the transaction—

15

remain an obligation of the ATM operator even if some or all of the interchange revenue is assigned to a third party. The panel found that those "class members who assign a portion of their payment obligations and revenues to other entities are no less injured by illegal practices that diminish the revenue." Op. 11. An ATM operator that assigns interchange revenue to a premises owner is "effectively making a rental payment." *Id.*; *see also* JA6888 (McAndrews report, stating that class members pay the acquirer fee "regardless of the contractual details or the accounting process of how exactly rent is paid to the landlord").

Defendants claim error in the panel's rejection of Defendants' argument that "multiple entities meet the operator plaintiffs' definition of 'operator' for a single ATM despite having paid no acquirer fee." Pet. 16. But the panel correctly recognized that "entities that manage ATM setup, service providers that handle ATM encryption keys, and retail stores that own on-site ATMs but do not originate transactions are *excluded from the Class Definition*." Op. 11 (emphasis added). Indeed, Visa's own rules "expressly exclude from the definition of ATM Operator those entities, such as merchants, that own or control property on which ATMs are located, even if the merchant owns or leases the ATM itself." JA3337, n.2. The operator Plaintiffs' Class Definition includes only entities authorized to connect to the network and originate a cash withdrawal transaction. JA520-522, JA3393-3394 (ATM Ops. Class Definition); *see also* Op. 11 (discussing the express exclusion of

third-party service providers and premises owners from the Class Definition).  As the panel put it, the failure to show harm to such entities "cannot detract from the predominance of questions common to the members of the class *as actually defined*."  *Id.* (emphasis added).

As the panel observed, "nothing [on this record] requires a conclusion that the ATM Operator class includes uninjured members."  *Id.*  Thus, "'individualized inquiries would not be necessary to ascertain the fees paid by each class member,'" Op. 10 (quoting district court, JA585), which "cuts to the heart of the predominance requirement: avoiding individualized mini-trials." *Id.*

## CONCLUSION

For the foregoing reasons, this Court should deny *en banc* review.

Dated:  September 12, 2023

Respectfully submitted,

/s/ Douglas G. Thompson Jr.

Douglas G. Thompson Jr
FINKELSTEIN THOMPSON LLP
2201 Wisconsin Ave, N.W.
Washington, DC 20001
Telephone: 202-337-8000
dthompson@finkelsteinthompson.com

Christopher Lovell
LOVELL STEWART HALEBIAN
JACOBSON LLP
500 Fifth Ave, Suite 2440
New York, NY 10110
Telephone: (212) 608 1900

*Counsel for Appellees Peter Burke, Kent
Harrison, Marin P. Heiskell, and Bryan
Byrnes, and the Independent ATM
Consumer Class*

/s/ Jonathan Rubin

Jonathan L. Rubin
MOGINRUBIN LLP
2101 L Street, N.W., Suite 300
Washington, D.C. 20037
Telephone: (202) 630-0616
jrubin@moginrubin.com

Daniel J. Mogin
MOGINRUBIN LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 687-6611
dmogin@moginrubin.com

*Class Counsel for the ATM Operator
Class Plaintiffs-Appellees*

/s/ Steve W. Berman

Steve W. Berman
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 2nd Ave., Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

David M. Cooper
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
davidcooper@quinnemanuel.com

Adam B. Wolfson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
adamwolfson@quinnemanuel.com

Ben M. Harrington
Benjamin J. Siegel
HAGENS BERMAN SOBOL
SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3034
benh@hbsslaw.com
bens@hbsslaw.com

*Co-Lead Counsel for the Mackmin
Consumer Class Plaintiffs-Appellees*

18

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit set forth in Fed. R. App. P. 35(b)(2) and (e), excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), because this document contains 3,887 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 font size and Times New Roman style.

Dated: September 12, 2023

*/s/ Steve W. Berman*
Steve W. Berman

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served by CM/ECF on September 12, 2023, to all counsel of record.

*/s/ Steve W. Berman*
Steve W. Berman